[No. S074270. July 31, 2000.]

In re JORGE M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JORGE M., Defendant and Appellant.

## Counsel

J. Courtney Shevelson, under appointment by the Supreme Court, and Lorraine L. Loder, under appointment by the Court of Appeal, for Defendant and Appellant.

Benenson & Kates, Don B. Kates; Trutanich Michel, C. D. Michel; Stephen P. Halbrook; Law Offices of Donald E. J. Kilmer and Donald E. J. Kilmer, Jr., for International Wound Ballistics Association, Law Enforcement Alliance of America, Eugene J. Wolberg and Dwight Van Horn as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec, Sanjay T. Kumar, John R Gorey and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—Jorge M., a minor, was adjudicated a ward of the juvenile court and ordered into a juvenile camp program, in part because he was found to have been in possession of an assault weapon, in violation of Penal Code[1] section 12280, subdivision (b) (hereafter section 12280(b)). The Court of Appeal reversed that finding on the ground the record contained insufficient evidence the minor knew the firearm had the characteristics bringing it within the definition of an assault weapon under the Assault Weapons Control Act (§§ 12275-12290 (hereafter the AWCA)), a mental element the Court of Appeal found implicit in section 12280(b) despite the absence of any express scienter language in the statute itself.

We agree with the Court of Appeal that section 12280(b), an alternative felony/misdemeanor punishable by up to three years in state prison (see §§ 17, subd. (b), 18), was not intended to define a strict liability offense. We disagree, however, that actual knowledge regarding the firearm's prohibited characteristics is required. Such a requirement would be inconsistent with the public safety goals of the AWCA. Effective enforcement of that law demands, instead, that a conviction be obtainable upon *proof of negligent failure to know*, as well as actual knowledge of, the weapon's salient characteristics; the People must prove, that is, that a defendant charged with possessing an unregistered assault weapon *knew or reasonably should have*

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

*known* the characteristics of the weapon bringing it within the registration requirements of the AWCA. Because the record of this case contains sufficient evidence to prove the requisite mens rea, we reverse the judgment of the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 5, 1996, while the 16-year-old minor was on in-home probation for possession of a controlled substance, law enforcement officers conducted a probation investigation at the minor's home. The main room of the house had bunk beds in one corner; a door led off this main room to the minor's parents' bedroom. Probation Officer Brian Tsubokawa asked the minor where he kept his personal possessions. The minor pointed to the bunk bed area in the main room. Los Angeles Police Department Officer Manuel Ramirez went to the bunk bed and found three rifles on the top bunk, which the minor told Officer Ramirez was his bed. On a clothes cabinet three feet or less from the minor's bed, Officer Ramirez also found an unregistered SKS-45 semiautomatic rifle with a detachable "banana clip" magazine.

The present petition was then filed against the minor under Welfare and Institutions Code section 602, charging him with possession of an assault weapon (§ 12280(b)) and with firearm possession in violation of the terms and conditions of his probation (§ 12021, subd. (d)).

At the adjudication hearing, the officers testified as described above. The minor testified he slept on the floor of his sisters' bedroom and that the weapons belonged to his father. He denied ever "playing" with the weapons. The minor's brother testified that all the rifles belonged to him and his father, not to the minor. He said that he slept on the top bunk bed and that the minor slept in a bedroom used by their sisters. The minor's mother corroborated the brother's account.

The juvenile court found the allegations of the petition true. The minor was adjudged a ward of the court and placed in a camp community placement program for a period not to exceed three years and eight months. The maximum period of confinement was calculated as follows: three years for the violation of section 12280(b); three years, stayed pursuant to section 654, for the violation of section 12021; and eight months, consecutive, for the drug possession charge for which the minor was on probation at the time of the current offenses.

The Court of Appeal reversed the section 12280(b) finding for insufficient evidence. Relying heavily on the persuasive authority of *Staples v. United*

*States* (1994) 511 U.S. 600 [114 S.Ct. 1793, 128 L.Ed.2d 608] (*Staples*), in which the United States Supreme Court held conviction under a federal firearms possession law required proof the defendant knew the features of the gun that brought it within the criminal prohibition, and *People v. Simon* (1995) 9 Cal.4th 493 [37 Cal.Rptr.2d 278, 886 P.2d 1271] (*Simon*), in which this court held conviction under a law proscribing the sale or purchase of securities by misrepresentation required proof the defendant knew or should have known the false or misleading nature of the representation, the Court of Appeal held that conviction under section 12280(b) requires proof the defendant "knew that the weapon possessed characteristics which brought it within the statutory definition of an assault weapon." The Court of Appeal, without elaborating the point, further asserted there was "no evidence" of such knowledge in this case.

We granted the Attorney General's petition for review.

## DISCUSSION

■■■ The AWCA, inter alia, requires registration of assault weapons, sets time periods for such registration, prohibits the possession of unregistered assault weapons, restricts the circumstances under which even registered assault weapons may be possessed (including a prohibition on their possession by minors) and allows exceptions to these restrictions by permit on good cause shown. (§§ 12280, 12285, 12286.) At the time of the minor's charged offense, the restricted firearms included only those defined as assault weapons in section 12276 and those declared to be assault weapons pursuant to section 12276.5.[2] The definition in section 12276, subdivisions (a) through (c), consists of a list, one item of which is "SKS with detachable magazine." (§ 12276, subd. (a)(11).) The question on review, therefore, is whether the Court of Appeal correctly held that the finding the minor possessed an unregistered assault weapon, in violation of section 12280(b), required proof the minor knew the weapon was an SKS with a detachable magazine.[3] To answer that question we must decide whether knowledge of the characteristics bringing a firearm within the AWCA is an element of section 12280(b)'s bar on possession.

---

[2] A generic definition of assault weapons, contained in section 12276.1, was added effective January 1, 2000. (Stats. 1999, ch. 129, § 7.) Sections 12276 and 12276.5 were not, however, repealed.

[3] Section 12281, added in 1998 (Stats. 1998, ch. 909, § 1), creates a retroactive immunity from prosecution under section 12280 for those possessing "SKS rifles" between January 1, 1992, and December 19, 1997. For purposes of section 12281, however, the meaning of "SKS rifle" is limited to "SKS rifles commonly referred to as 'SKS Sporter' versions, manufactured to accept a detachable AK-47 magazine . . . ." (§ 12281, subd. (i).) No evidence suggests the SKS-45 involved in this case meets either part of that definition, nor has the minor argued he comes within section 12281's immunity.

Section 12280(b) provides in pertinent part: "[A]ny person who, within this state, possesses any assault weapon, except as provided in this chapter, is guilty of a public offense and upon conviction shall be punished by imprisonment in the state prison, or in a county jail, not exceeding one year."

That the statute contains no reference to knowledge or other language of mens rea is not itself dispositive. As we recently explained, the requirement that, for a criminal conviction, the prosecution prove some form of guilty intent, knowledge, or criminal negligence is of such long standing and so fundamental to our criminal law that penal statutes will often be construed to contain such an element despite their failure expressly to state it. "Generally, ' "[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." . . .' (*People* v. *Simon*[, *supra*,] 9 Cal.4th 493, 519 . . . , citations omitted.) In other words, there must be a union of act and wrongful intent, or criminal negligence. (Pen. Code, § 20; *People* v. *Vogel* (1956) 46 Cal.2d 798, 801 [299 P.2d 850].) 'So basic is this requirement that it is an invariable element of every crime unless excluded expressly or by necessary implication.' (*People* v. *Vogel, supra*, at p. 801, fn. omitted.)" (*People v. Coria* (1999) 21 Cal.4th 868, 876 [89 Cal.Rptr.2d 650, 985 P.2d 970].)

Equally well recognized, however, is that for certain types of penal laws, often referred to as public welfare offenses, the Legislature does not intend that any proof of scienter or wrongful intent be necessary for conviction. "Such offenses generally are based upon the violation of statutes which are purely regulatory in nature and involve widespread injury to the public. (*People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1057-1058 [9 Cal.Rptr.2d 348].) 'Under many statutes enacted for the protection of the public health and safety, e.g., traffic and food and drug regulations, criminal sanctions are relied upon even if there is no wrongful intent. These offenses usually involve light penalties and no moral obloquy or damage to reputation. Although criminal sanctions are relied upon, the primary purpose of the statutes is regulation rather than punishment or correction. The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement.' (*People* v. *Vogel, supra*, 46 Cal.2d at p. 801, fn. 2.)" (*People v. Coria, supra*, 21 Cal.4th at pp. 876-877.)

 Whether section 12280(b) can properly be categorized as a public welfare offense, for which the Legislature intended guilt without proof of any scienter, is a question of first impression to which the answer is not obvious. On the one hand, the AWCA, including section 12280, is clearly aimed at protecting public safety by regulating and restricting the possession of assault weapons. (See § 12275.5 ["The Legislature hereby finds and

declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession."]; see also *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482-486 [97 Cal.Rptr.2d 334, 2 P.3d 581].) On the other hand, the penalties imposed under section 12280(b), an alternative felony/misdemeanor (a "wobbler"), are not "light" (*People v. Vogel, supra*, 46 Cal.2d at p. 801, fn. 2), and a degree of "moral obloquy or damage to reputation" (*ibid.*) necessarily attaches to a felony conviction. In view of the weighty penalty, it is not patently true that "the primary purpose of the statute[] is regulation rather than punishment or correction." (*Ibid.*) As the text and penal nature of section 12280(b) do not provide a clear answer to our question, a fuller examination is required.

■ A leading criminal law treatise (1 LaFave & Scott, Substantive Criminal Law (1986) § 3.8(a), pp. 342-344) lists several considerations courts have commonly taken into account in deciding whether a statute should be construed as a public welfare offense: (1) the legislative history and context; (2) any general provision on mens rea or strict liability crimes; (3) the severity of the punishment provided for the crime ("Other things being equal, the greater the possible punishment, the more likely some fault is required"); (4) the seriousness of harm to the public that may be expected to follow from the forbidden conduct; (5) the defendant's opportunity to ascertain the true facts ("The harder to find out the truth, the more likely the legislature meant to require fault in not knowing"); (6) the difficulty prosecutors would have in proving a mental state for the crime ("The greater the difficulty, the more likely it is that the legislature intended to relieve the prosecution of that burden so that the law could be effectively enforced"); (7) the number of prosecutions to be expected under the statute ("The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to go into the issue of fault"). **(1c)** Finding this framework useful here, where the legislative intent is not readily discerned from the text itself, we consider each factor in turn.

1. *The Statute's History and Context*

The AWCA's origins and legislative history are reviewed in detail in *Kasler v. Lockyer, supra*, 23 Cal.4th at pages 482-487 (*Kasler*). Suffice it to

say here the legislation, enacted in 1989, was prompted by the belief that assault weapons posed a real, severe and growing threat to public safety, urgently requiring regulation and restriction to reduce the number of such weapons finding their way into the hands of street gangs, drug dealers and the mentally ill. The legislative history indicates that while few knowledgeable observers questioned the existence or gravity of the assault weapons problem, several individuals expressed significant reservations about the remedial measures proposed. In particular, the generic definition of assault weapon contained in the bills under consideration concerned many. Witnesses at the hearing conducted by the Assembly sitting as a Committee of the Whole (see *Kasler, supra,* at pp. 482-483) complained the bills would "throw the baby out with the dishwater [*sic*]" by including too many semiautomatic rifles that had legitimate uses, and that it was, in practice, impossible to formulate a generic definition that would include military-style weapons but exclude legitimate sporting guns. (1 Assem. J. (1989-1990 Reg. Sess.) pp. 449, 451.) When the law's final compromise form, containing a definition by list rather than a generic description, obtained approval from key political figures, Governor Deukmejian, who had expressed misgivings about the generic approach (see *Kasler, supra,* at p. 487), was quoted as saying, "The result of our efforts have been to clarify provisions of the laws and to provide more certainty regarding which guns are covered." (*Deukmejian, Roberti Agree on Weapons Bill,* San Diego Tribune (May 4, 1989) p. A1, reprinted in Forsyth, Assault Weapons in California: a Case Study in Issue Management and the Media (1989) p. 8.)

The law's origins as a legislative response to a serious public safety problem, reflected in this history and in the statutory findings and statement of purpose (§ 12275.5), tend to place the AWCA, including section 12280(b), in the category of public welfare offenses, of which the primary goal is regulation for the public welfare or safety rather than punishment of individual offenders. Moreover, from the fact that the list in section 12276 apparently was intended to provide " 'a more exact definition' " (*Kasler, supra,* 23 Cal.4th at p. 485) of assault weapons than the original bill, one might infer the Legislature viewed the provisions of the law, as finally enacted, as providing a definition sufficiently certain and detailed that ordinary gun owners would have little difficulty determining if their firearms had to be registered. In this sense, the statute's history suggests, if only weakly, that the Legislature intended to place on the owners or possessors of semiautomatic weapons[4] the onus of determining whether their firearms had the characteristics bringing them within the new law.

On the other hand, the legislative statement of purpose in section 12275.5 includes, as its last sentence, the following: "It is not, however, the intent of

---

[4] A semiautomatic firearm "fires once for each pull on the trigger and reloads automatically, but requires the shooter to release the trigger lever before another shot can be fired." (Walter,

the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." As the AWCA restricts only certain semiautomatic weapons, one could infer the Legislature believed those it left unrestricted did have significant sporting or recreational uses. In this sense, as the minor argues, the AWCA was clearly not premised on the view that "all semiautomatic firearms were henceforth suspect and to be possessed only at the risk of subjecting oneself to criminal liability."

Beyond these conflicting and somewhat attenuated inferences, the legislative history reveals no specific evidence of an intent to include or exclude any particular scienter in the elements of section 12280(b). Nor does the language of any of the AWCA's other substantive provisions clearly indicate a legislative intent to eliminate any mens rea element for a section 12280(b) violation.[5]

We turn, therefore, to the AWCA's broader statutory context. The AWCA was codified as chapter 2.3 of title 2 of part 4 of the Penal Code. Title 2, which encompasses sections 12000 through 12809, is entitled Control of Deadly Weapons and contains numerous provisions aimed at controlling the ownership, possession, and use of firearms and other dangerous weapons. Among these provisions are: section 12020, punishing as a wobbler the possession of any of a long list of weapons, including short-barreled shotguns and rifles, undetectable firearms, explosive bullets, nunchakus, shurikens, multiburst trigger activators, concealed dirks or daggers, blackjacks and

---

Rifles of the World (2d ed. 1998) p. 498.) An automatic firearm "will continue firing until either the trigger is released or the ammunition has been expended." (*Id.* at p. 493.)

[5]Two portions of section 12280 manifest legislative solicitude for gun owners who might unknowingly be in possession of newly restricted assault weapons. Subdivision (b), after specifying that illegal possession of an assault weapon is generally punishable as a wobbler, provides a much reduced sanction (an infraction carrying a fine of up to $500) for first-time offenders who possessed the weapon prior to the AWCA's effective date or the date the weapon was added to the list of assault weapons, have since registered the weapon, and have restricted their use and possession of the weapon in the manner prescribed in section 12285, subdivision (c). Subdivision (j) provides grace periods, during which subdivision (b)'s criminal sanctions do not apply, corresponding to the various statutory registration periods (see § 12285, subd. (a)) for guns listed in section 12276, added pursuant to section 12276.5, or coming within the definition added in section 12276.1. Yet these mitigating provisions are far from complete. For example, a person who innocently—without any reason to believe the firearm is or might be restricted—came into possession of an assault weapon listed in section 12276 after the registration period for such guns had passed (that is, after December 31, 1990), would have no opportunity to register the gun and, if found in possession and charged under section 12280(b), could not take advantage of the infraction provision of that statute. The same is true of anyone who comes into possession of a gun added to the list by the procedure in section 12276.5 after the 90-day registration period applying to such a listing. We are not convinced the Legislature regarded such persons' possession as felonious if they neither knew nor should have known of the characteristics bringing the gun within the strictures of the AWCA.

lipstick case knives; section 12021, which, inter alia, punishes as a felony the ownership or possession of firearms by convicted felons; section 12025, punishing as a misdemeanor, wobbler, or felony, depending on the circumstances, the carrying of a concealed firearm; section 12031, punishing as a misdemeanor, wobbler, or felony, depending on the circumstances, the public carrying of a loaded firearm; section 12220, which, inter alia, punishes as a felony the possession of a machine gun; section 12303, punishing as a wobbler the possession of a destructive device; and section 12320, punishing as a wobbler the knowing possession of armor-piercing handgun ammunition.

In a number of cases predating the AWCA's 1989 enactment, Courts of Appeal construed various of these weapons laws as not requiring knowledge of the characteristics bringing the weapon within the statutory restriction or prohibition. (See *People v. Corkrean* (1984) 152 Cal.App.3d 35, 37-41 [199 Cal.Rptr. 375] [§ 12220; knowledge gun fires automatically not an element of anti-machine-gun law]; *People v. Daniels* (1953) 118 Cal.App.2d 340, 343-345 [257 P.2d 1038] [same for predecessor to § 12220]; *People v. Harrison* (1969) 1 Cal.App.3d 115, 120 [81 Cal.Rptr. 396] [§ 12031, subd. (a); knowledge gun is loaded not an element of misdemeanor offense of carrying loaded firearm in vehicle]; *People v. Azevedo* (1984) 161 Cal.App.3d 235, 239-241 [207 Cal.Rptr. 270] [§ 12020, subd. (a); knowledge of sawed-off shotgun's contraband character not an element].)[6]

The Attorney General observes that some of these decisions rely on the statutes' lack of a requirement the defendant "knowingly" possess the weapon. (See, e.g., *People v. Daniels, supra,* 118 Cal.App.2d at pp. 344-345.) The Legislature, his argument continues, at the time it enacted the AWCA, was presumably aware of this "uniform" interpretation of the deadly weapons laws and, therefore, by again omitting any express reference to the possessor's knowledge, must have intended to impose liability without any element of scienter. The minor responds that the AWCA is distinguishable from sections 12020 and 12220, in that the latter restrict *all* machine guns, short-barreled shotguns, explosive ammunition and the like, while the

---

[6]Several post-AWCA Court of Appeal decisions regarding other weapons laws reached similar conclusions. (See *People v. Valencia* (1989) 214 Cal.App.3d 1410, 1412-1416 [263 Cal.Rptr. 301]; *People v. Lanham* (1991) 230 Cal.App.3d 1396, 1401-1405 [282 Cal.Rptr. 62]; *In re Ramon A.* (1995) 40 Cal.App.4th 935, 938-942 [47 Cal.Rptr.2d 59].) This court, however, recently reached a contrary conclusion as to section 12020's prohibition on carrying a concealed dirk or dagger, holding it requires knowledge that the instrument has the characteristics making it a dirk or dagger, despite the absence of any language of mens rea in that statute. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 331-332 [96 Cal.Rptr.2d 735, 1 P.3d 52].)

AWCA restricts only selected semiautomatic weapons and expressly disavows (in the last sentence of § 12275.5, quoted earlier) any intent to restrict other semiautomatic weapons with legitimate sporting uses.[7]

For two reasons, we agree with the minor that the pre-1989 Court of Appeal decisions on deadly weapons laws are not compelling evidence the Legislature intended section 12280(b) to lack any scienter element. First, the precedential history is not as clear or definitive as the Attorney General portrays it. As of 1989, this court had not ruled on whether knowledge of the weapon's illegal characteristics was an element of any of the state's deadly weapons laws; the few statements we had made on the subject, moreover, did not point clearly to liability without any scienter. Thus, in *People v. Snyder* (1982) 32 Cal.3d 590, 593 [186 Cal.Rptr. 485, 652 P.2d 42], while rejecting the claim a convicted felon in possession of a firearm must know of his legal status to violate section 12021, we stated that "the crucial question is whether the defendant *was aware that he was engaging in the conduct proscribed by that section*." (Italics added.) Similarly, in *Galvan v. Superior Court* (1969) 70 Cal.2d 851, 868 [76 Cal.Rptr. 642, 452 P.2d 930], construing a San Francisco gun registration law, we stated, " 'The only knowledge required is *knowledge of the character of the object possessed*; knowledge that the possession is illegal is unnecessary.' " (Italics added.) At the same time, in the related area of criminal penalties for possession of controlled substances, we had consistently construed such laws to require knowledge of the character of the substance possessed, despite the absence in the statutes of mens rea language. (*People v. Williams* (1971) 5 Cal.3d 211, 215 [95 Cal.Rptr. 530, 485 P.2d 1146]; *People v. Winston* (1956) 46 Cal.2d 151, 158-161 [293 P.2d 40]; see also *People v. Coria, supra,* 21 Cal.4th at pp. 875-880 [citing additional cases on transportation, sale and cultivation of drugs, and adopting same construction for crime of manufacturing methamphetamine].) One Court of Appeal, in an appeal from convictions for possession of a sawed-off shotgun (§ 12020) and possession of morphine

---

[7]The minor also argues the reasoning and result of the machine gun cases (*People v. Corkrean, supra,* 152 Cal.App.3d 35, and *People v. Daniels, supra,* 118 Cal.App.2d 340) should be reexamined in light of *Staples, supra,* 511 U.S. 600, which reached the opposite conclusion—finding a knowledge requirement—as to the similar federal ban on machine guns, and that all the cases relied upon by the Attorney General are suspect in light of the reasoning in *Staples, supra,* at pages 605-606 [114 S.Ct. at pp. 1797], and *Simon, supra,* 9 Cal.4th at pages 519-522, that the requirement of mens rea is the rule in construing criminal laws, and the narrow class of public welfare crimes is an exception to that rule. Because this case involves only the interpretation of the AWCA, we have no occasion to address the interpretation of other weapons laws. We note, however, that, in addition to potentially significant differences in statutory language, there are other important considerations that come into play when a court is requested to modify an established judicial interpretation of a statute. (See, e.g., *Patterson v. McLean Credit Union* (1989) 491 U.S. 164, 172-173 [109 S.Ct. 2363, 2370, 105 L.Ed.2d 132] [noting special force of stare decisis considerations in area of statutory interpretation].)

(Health & Saf. Code, former § 11500), had generalized the scienter rule for possession as follows: "It is, of course, true that to establish unlawful possession of a contraband object it must be shown that the defendant exercised dominion and control over the object with *knowledge of its* presence and *contraband character*." (*People v. Prochnau* (1967) 251 Cal.App.2d 22, 30 [59 Cal.Rptr. 265], italics added.) Thus, as of 1989, the appellate decisions regarding the scienter required for possessory offenses, including those involving deadly weapons, were not uniform in result. The Legislature in that year would not, therefore, necessarily have assumed that a felony offense punishing simple possession of a weapon would be construed as a strict liability crime if the statute failed to include any language of scienter.

Second, as the minor suggests, the Legislature may have regarded the statutory prohibitions construed in the Attorney General's cited Court of Appeal decisions as significantly distinguishable from the AWCA. Those decisions rest in part on the belief that sawed-off shotguns and machine guns are so easily distinguishable, and so patently tailored to criminal activity, that unknowing and innocent possession is unlikely. (See *People v. Azevedo*, *supra*, 161 Cal.App.3d at p. 240 [sawed-off shotguns described as members of "a class of instruments normally used only for criminal purposes"]; see also *id.* at p. 241 [court concludes "[i]t is not a heavy burden for a person who knowingly possesses a sawed-off shotgun to first determine the dimensions of that weapon or otherwise possess it at his or her own peril"]; *People v. Daniels*, *supra*, 118 Cal.App.2d at p. 345 ["No doubt the Legislature felt that possession of a machine gun could hardly be had without knowledge that the object was in fact a machine gun"].) In contrast, while the drafters and enactors of the AWCA clearly regarded as particularly dangerous, because of their criminal use, the assault weapons to be restricted, they also recognized that the enumerated weapons belonged to the larger class of semiautomatic firearms, some of which were primarily designed and used for lawful activities such as hunting and target shooting. (§ 12275.5, last sentence.) Nothing in the AWCA suggests the Legislature regarded the distinctions between these two groups of weapons to be so patent and definite that innocent and unknowing possession of a restricted assault weapon would be particularly unlikely.

The machine gun cases further rest on the fact that the machine gun statute itself (§ 12220) contains language of scienter ("knowingly") in its prohibition on transporting, but not in its prohibition on simple possession. (See *People v. Corkrean*, *supra*, 152 Cal.App.3d at pp. 38-39; *People v. Daniels*, *supra*, 118 Cal.App.2d at pp. 344-345.) In contrast, section 12280 does not contain language of scienter in any of its prohibitions. For these reasons, and contrary to the Attorney General's contention, the strict liability construction

given some other deadly weapon statutes by the Courts of Appeal before 1989 is not strong evidence of the intent of the Legislature in enacting the AWCA.

### 2. General Provision on Mens Rea

■ California law contains a generally applicable rule on mens rea: section 20, which provides, "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." The interpretive rule embodied in this statute is by no means inflexible, public welfare offenses being the chief recognized exception. Nonetheless, at least where the penalties imposed are substantial, section 20 can fairly be said to establish a presumption against criminal liability without mental fault or negligence, rebuttable only by compelling evidence of legislative intent to dispense with mens rea entirely. (See *People v. Vogel, supra,* 46 Cal.2d at p. 801 [union of act and wrongful intent so basic that "it is an invariable element of every crime unless excluded expressly or by necessary implication" (fn. omitted)]; *People v. Hernandez* (1964) 61 Cal.2d 529, 533 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092] [noting "this court has moved away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability"]; *Simon, supra,* 9 Cal.4th at p. 521 [§ 20 applicable except "where the purpose is to protect public health and safety and the penalties are relatively light"]; see also *Staples, supra,* 511 U.S. at p. 606 [114 S.Ct. at p. 1794] ["presumption favoring *mens rea*" applies absent a contrary "indication of congressional intent, express or implied"].)

### 3. Severity of Punishment

■ As already noted, possession of an unregistered assault weapon under section 12280(b) is an alternative felony/misdemeanor, also known as a wobbler; that is, the offense is a felony unless charged as a misdemeanor or reduced to a misdemeanor by the sentencing court. (§ 17, subd. (b).) Because the felony punishment specified is simply "imprisonment in the state prison," the prison sentence for a felony violation of section 12280(b) may be 16 months, two years, or three years, in the guided discretion of the sentencing court. (§§ 18, 1170.) If qualifying prior felony convictions are pleaded and proven, a person convicted of a felony violation of section 12280(b) could face even greater punishment, including an indeterminate sentence of 25 years to life. (§§ 667, subds. (b)-(i), 1170.12.)

In *Staples, supra,* 511 U.S. at page 618 [114 S.Ct. at page 1804], the United States Supreme Court observed that its own early cases "might

suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense." The high court ultimately found it unnecessary to embrace that view as a definitive rule, but did conclude the harsh potential penalties—up to 10 years' imprisonment—imposed under the federal law at issue for possession of an unregistered machine gun militated strongly against a construction dispensing with mens rea. (*Id.* at pp. 616-619 [114 S.Ct. at p. 1804].) This court agreed with *Staples*'s skepticism about felony punishment for putative public welfare offenses in *People v. Coria*, *supra*, 21 Cal.4th at page 877, observing that manufacturing methamphetamine "is a felony, which is ' " 'as bad a word as you can give to man or thing.' " ' " Such an offense, we concluded, is difficult to characterize as "a mere regulatory statute which imposes light penalties with no damage to reputation." (*Ibid.*)

Like the high court in *Staples*, we refrain from stating any inflexible rule regarding punishment for public welfare offenses. The Legislature's choice of potential felony punishment for violation of section 12280(b), however, reinforces the presumption expressed by section 20 and suggests that correspondingly strong evidence of legislative intent is required to exclude mens rea from the offense.

### 4. *Seriousness of Harm to the Public*

As already discussed, the Legislature in 1989 regarded the use of assault weapons by criminals and the mentally ill as a grave public safety threat. The information reflected in the AWCA's legislative history, and that collected since in connection with federal regulatory efforts directed at the same problem (see generally H.R.Rep. No. 103-489, 2d Sess., pp. 13-15, 18-20 (1994) [discussing criminal use of semiautomatic assault weapons and features that increase their lethality]; U.S. Dept. of the Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (Apr. 1998) pp. 30-35 [discussing criminal attractiveness and use of semiautomatic assault rifles accepting large capacity magazines]), give this court no cause to question or qualify the legislative assessment of the harm caused by the proliferation of such firearms in civilian society.

The AWCA is a remedial law aimed at protecting the public against a highly serious danger to life and safety. The Legislature presumably intended that the law be effectively enforceable, i.e., that its enforcement would actually result in restricting the number of assault weapons in the hands of criminals and the mentally ill. In interpreting the law to further the legislative intent, therefore, we should strive to avoid any construction that would significantly undermine its enforceability. This is not to suggest this

court would or should read any element out of a criminal statute simply to ease the People's burden of proof. But, when a crime's statutory definition does not expressly include any scienter element, the fact the Legislature intended the law to remedy a serious and widespread public safety threat militates against the conclusion it also intended impliedly to include in the definition a scienter element especially burdensome to prove.

### 5. Difficulty of Ascertaining Facts

Courts have been justifiably reluctant to construe offenses carrying substantial penalties as containing no mens rea element "where . . . dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct." (*Staples, supra,* 511 U.S. at p. 618 [114 S.Ct. at p. 1795].) This interpretive guideline holds with particular strength when the characteristics that bring the defendant's conduct within the criminal prohibition may not be obvious to the offender. In *Staples,* for example, the federal statute at issue criminalized possession only of fully automatic firearms, but the briefing and record before the court indicated that many or most semiautomatic firearms may be converted by internal modification to fire automatically. (*Id.* at pp. 612, fn. 6, 615 [114 S.Ct. at pp. 1800, 1802].) Observing that, certain military arms and notoriously criminal weapons aside, firearms, including semiautomatic firearms, enjoy "a long tradition of widespread lawful . . . ownership by private individuals in this country" (*id.* at p. 610 [114 S.Ct. at p. 1799]) and, despite their destructive potential, "have been widely accepted as lawful possessions" (*id.* at p. 612 [114 S.Ct. at p. 1800]), the high court found it "'unthinkable to us that Congress intended to subject such law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if . . . what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon.'" (*Id.* at p. 615 [114 S.Ct. at p. 1802], ellipses and brackets in *Staples.*)

Similarly, in *People v. Coria, supra,* 21 Cal.4th at page 880, construing a criminal bar on manufacturing methamphetamine to require knowledge that methamphetamine was being made, this court observed that, absent knowledge of the substance being synthesized, the conduct could be entirely innocent: "Not all acts of chemical synthesis are illegal; only the manufacture of specific controlled substances is prohibited." Moreover, the chemical composition or potential illicit use of a substance is not necessarily obvious to participants, and unknowing participation in the manufacturing process was not inherently unlikely: "the principal manufacturers of illicit drugs occasionally may employ naive, unsophisticated, and relatively unskilled helpers to assist in the manufacturing process." (*Id.* at p. 881.)

The parties debate the application of these principles to construction of section 12280(b). The Attorney General maintains the weapons listed in section 12276 are "highly dangerous offensive weapons which are unambiguously hazardous. Assault weapons are typically used by soldiers in a war. . . . The assault weapons listed in section 12276, like the SKS with detachable magazine, are not 'ambiguous substances' such that a person would not be aware of the dangerous character of the weapon after looking at one." The minor, in contrast, again stresses that the AWCA restricts only a subset of semiautomatic firearms, leaving the remainder available for lawful uses such as hunting and target shooting, and that even those semiautomatic firearms classified as assault weapons may, if registered, be lawfully possessed and used for these purposes. (See § 12285, subd. (c).)

On this point the minor has the better argument. The Attorney General may be correct that anyone who knew the firearm he or she possessed was an "assault weapon" would be likely to know it was potentially regulated or contraband. But this begs the question, for the issue is precisely whether a person violates section 12280(b) if he or she does *not* know the gun has the characteristics making it an assault weapon. (See *Staples, supra,* 511 U.S. at p. 609 [114 S.Ct. at p. 1799] [the assumption a person knows the particularly dangerous character of the weapon cannot form the predicate for construction of the statute "when, as in this case, the very question to be decided is *whether* the defendant must know of the particular characteristics" bringing the firearm within the statutory prohibition].)

As to whether the possessor of a weapon listed in section 12276 would, in all or most cases, "be aware of the dangerous character of the weapon after looking at one," the Attorney General does not demonstrate, or even attempt to demonstrate, that the listed weapons are universally distinguishable by their appearance from firearms not listed in section 12276. Comparison of the photographs of listed rifles in the California Attorney General's Assault Weapons Identification Guide (1993) (hereafter Identification Guide) with photographs of unlisted rifles in a general reference work (Walter, Rifles of the World, *supra*) fails to bear out the assumption. While many of the rifles depicted in the Identification Guide are of particularly menacing appearance, with folding or telescoping stocks, forward pistol grips, bullpup configuration or other unusual external features, others, with fixed wooden stocks and a relatively conventional rifle appearance, are not obviously unsuited, to the untrained eye at least, for hunting, ranching and farming uses, or target shooting. (See, e.g., Identification Guide at pp. 6 [Baretta AR-70], 7 [CETME Sporter], 18 [SKS with detachable magazine], 23 [Springfield Armory BM 59], 26 [Valmet M62S], 28 [Valmet M78S].) Conversely, several unlisted semiautomatic rifles have unusual military-type features and

appear, again to the untrained eye, unlikely to be sporting or working guns. (See, e.g., Walter, Rifles of the World, *supra*, at pp. 384 [PMC Paratrooper], 404 [Ruger Mini-14/5RF], 442 [Universal Paratrooper], 439 [Stoner Model 63A1].)

Nor can it be said that all semiautomatic rifles, or even all assault rifles, lack all lawful use, so that anyone in possession of one is overwhelmingly likely to be aware they are restricted or banned firearms. In a recent federal government study (U.S. Dept. of the Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, *supra*) professional hunting guides were surveyed on their clients' use of, and their own recommendations for, semiautomatic rifles in hunting. A large number of the guides reported that their clients have used semiautomatic rifles. The most common semiautomatic rifles used were those made by or on designs of Browning and Remington, but some listed weapons, including the SKS, AK-47, HK-91, SIG 550, and FN-FAL, were reported as used or recommended by individual clients or guides. (*Id.*, appen., survey results table.) From this and other sources, the study authors concluded the particular rifles being reviewed, variants on AK-47, FN-FAL, HK91 and 93, SIG SG550, and Uzi designs modified to eliminate some military configuration features but still accepting large capacity magazines, "sometimes are used for hunting; however, their actual use in hunting is limited. . . . [¶] . . . [¶] [W]hile these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting." (*Id.* at pp. 16, 26-28.)

The same study surveyed competitive shooting groups. Thirty-one such groups responded that they conducted events using high-power semiautomatic rifles. Of these, all but one permitted the use of the assault rifles under review for some or all competitions. One organization responded that in "practical shooting" events "rifles with designs based on the AR15, AK47, FN-FAL, HK91, HK93 and others are allowed and must be used to be competitive." (U.S. Dept. of the Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, *supra*, at pp. 28-29.)[8] Although the Treasury Department study focused on imported assault rifles, the authors note that certain competitive shooting events require use of United States military service rifles. (*Id.* at p. 29.) Of the rifles listed in section 12276, at least two, the AR-15 and the BM59, are, or derive closely from,

---

[8]"Practical shooting involves moving, identifying, and engaging multiple targets and delivering a number of shots rapidly. In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, 'no shoots,' steel reaction targets, movers, and others to challenge them." (U.S. Dept. of the Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, *supra*, at p. 17, fn. 48.)

United States military service rifles. (Walter, Rifles of the World, *supra*, at pp. 233, 316-319.)

Finally, we observe that section 12276 lists weapons primarily by manufacturer and model. "Accordingly, the identification markings are the most important factor in determining if a particular firearm is an 'assault weapon'" within the meaning of section 12276. (Identification Guide, *supra*, Foreword.) Yet the Identification Guide also suggests markings may vary from gun to gun: "Department of Justice staff has attempted to locate examples of each of the identified 'assault weapons' to identify accurately the markings on them. However, some of the identified 'assault weapons' were not physically located and some which were found were not marked as specified in Section 12276." (Identification Guide, *supra*, Foreword.) Accompanying the Identification Guide's photograph of a Valmet M78S (listed in § 12276, subd. (a)(16)) is the note, "No firearm marked **M78S** has been located. However, the firearm pictured may be the **M78S**." A similar note accompanies the photograph of a SIG PE-57 (listed in § 12276, subd. (a)(12)). (Identification Guide, *supra*, at pp. 20, 28.) Consequently, although most firearms listed in section 12276 are likely to be readily identifiable, some instances in which the possessor of a semiautomatic firearm could reasonably be in doubt as to whether the weapon is subject to regulation under the AWCA are also likely.

As the Legislature recognized (see § 12275.5), many semiautomatic weapons, including some of the listed assault weapons, have lawful uses; moreover, that a particular semiautomatic weapon is likely to be specially regulated as an assault weapon may not be readily apparent to all those who possess it. Thus, a construction of section 12280(b) that dispenses completely with scienter may result in the severe punishment of innocent possessors, a result we do not believe the Legislature intended.

### 6. *Difficulty of Proving Mental State*

We previously noted the seriousness of the public safety threat the Legislature perceived and sought to alleviate by the AWCA and the corresponding unsuitability, to the legislative intent, of any statutory construction that would likely impair the law's effective enforcement. It follows we should not read section 12280(b) as containing any mental state requirement that the prosecution would foreseeably and routinely have special difficulty proving.

An actual knowledge element has significant potential to impair effective enforcement. Although knowledge may be proven circumstantially (1 Witkin, Cal. Evidence (3d ed. 1986) Circumstanial Evidence, § 408, pp. 381-382), in many instances a defendant's direct testimony or prior statement

that he or she was actually ignorant of the weapon's salient characteristics will be sufficient to create reasonable doubt. Although the People could rebut a claim of actual ignorance by evidence of the defendant's long and close acquaintance with the particular weapon or familiarity with firearms in general, production of such evidence would predictably constitute a heavy burden for the prosecution.

A scienter requirement satisfied by proof the defendant *should* have known the characteristics of the weapon bringing it within the AWCA, however, would have little or no potential to impede effective enforcement. In most instances the fact a firearm is of a make and model listed in section 12276, or added pursuant to section 12276.5, can be expected to be sufficiently plain on examination of the weapon so that evidence of the markings, together with evidence the accused possessor had sufficient opportunity to examine the firearm, will satisfy a knew-or-should-have-known requirement. (See, e.g., Identification Guide, *supra*, at pp. 3 [Norinco 86S identifiable by marking "**86S** located on left side of receiver near the rear"], 4 ["**Uzi** usually located on the left side of the receiver near the rear"], 5 ["**Galil** usually found on the left side of the receiver above the pistol grip"], 6 ["**AR 70** on the left side of the receiver near the top"], 7 [**CETME 'Sport'** usually found on left side of the magazine well"].)[9] Furthermore, because of the general principle that all persons are obligated to learn of and comply with the law, in many circumstances a trier of fact properly could find that a person who knowingly possesses a semiautomatic firearm reasonably should have investigated and determined the gun's characteristics. The exceptional cases in which the salient characteristics of the firearm are extraordinarily obscure, or the defendant's possession of the gun was so fleeting or attenuated as not to afford an opportunity for examination, would appear to be instances of largely innocent possession that, as discussed above, the Legislature presumably did not intend to be subject to felony punishment.

The Attorney General suggests that if section 12280(b) is construed to require some mens rea, it should be "knowledge simply of possession" of the firearm. We agree section 12280(b), like criminal possession laws generally, requires knowledge of the object's existence and of one's control over it. (See *People v. Gory* (1946) 28 Cal.2d 450, 455 [170 P.2d 433].) But we believe the Legislature intended section 12280(b) to require, as well, a degree of scienter regarding the *character* of the firearm; without such a scienter element, the possibility of severely punishing innocent possession is too great.

---

[9]Our conclusion would not be altered by consideration of the generic definition of "assault weapon" in section 12276.1, added by amendment in 1999. That section defines the class of restricted weapons by their possession of specified and readily discernible physical characteristics.

A group of amici curiae argues for a required mens rea even greater than knowledge of the weapon's characteristics: "actual knowledge by defendants that a firearm they possessed is one that is covered by the Act." According to their brief, such an extraordinary level of scienter is needed here because "the ordinary citizenry does not have the esoteric firearms knowledge necessary to follow what this complex and confusing Act allows, and what it prohibits." Amici curiae's prime concrete example of this complexity and confusion consists of the fact that the Attorney General's office has inconsistently interpreted section 12276, subdivision (a)(11), listing "SKS with detachable magazine," as to whether that designation includes certain SKS models originally manufactured with a fixed magazine but adapted to accept a detachable magazine. (See Sen. Com. on Public Safety, Analysis of Assem. Bill No. 48 (1997-1998 Reg. Sess.) as amended June 18, 1998, pp. 4-8.)[10]

That a criminal statute contains one or more ambiguities requiring interpretation does not make the statute unconstitutionally vague on its face (see *People v. Askey* (1996) 49 Cal.App.4th 381, 386-387 [56 Cal.Rptr.2d 782]), nor does it imply the statute cannot, in general, be fairly applied without proving knowledge of its terms. In cases where the information reasonably available to a gun possessor is too scant to prove he or she should have known the firearm had the characteristics making it a defined assault weapon, the possessor will not be subject to section 12280(b) as construed here. This is sufficient to protect against any significant possibility of punishing innocent possession. To require more—especially to require knowledge of the law as the amici curiae propose—would seriously impede effective enforcement of the AWCA, contrary to the legislative intent. Nothing in the language or history of the AWCA suggests the Legislature intended to create, in section 12280, an exception to the fundamental principle that all persons are obligated to learn of and comply with applicable laws.

---

[10]The amici curiae group requests we take judicial notice of a variety of materials, some mislabeled or misdescribed in the request. These include published background material on the history of the SKS rifle, a Kern County Superior Court order granting habeas corpus relief to an individual convicted of possessing a Bushmaster Assault Rifle, a copy of a portion of the Identification Guide, a California Department of Justice bulletin regarding use of the Identification Guide, copies of briefs filed in this and other courts in various cases, a newspaper article from 1995 criticizing the Attorney General for supporting gun control efforts, and a one-page excerpt from an unpublished manuscript on the politics of gun control legislation. We deny the request. Much of the material is completely irrelevant to the issues presented in the petition for review and briefed by the parties. To the extent it is relevant to the purely legal question of section 12280's interpretation, the material may be considered without formal notice. As observed in the California Law Revision Commission comment to Evidence Code section 450, the Evidence Code does not limit courts' consultation of "whatever materials are appropriate in construing statutes, determining constitutional issues, and formulating rules of law." (Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 450, p. 420.)

### 7. *Number of Expected Prosecutions*

As previously discussed here and in *Kasler, supra*, 23 Cal.4th 472, the Legislature enacted the AWCA in response to what it viewed as a statewide problem of increasing gravity, the rapidly growing use of assault weapons in incidents of criminal violence. Attacking what it perceived to be a widespread threat, the Legislature presumably anticipated a significant number of prosecutions would ensue under the law. Again, our construction should not impose a scienter requirement that would unduly impede the ability to prosecute substantial numbers of violators.

### CONCLUSION

Although the AWCA can be characterized as a remedial law aimed at protecting public welfare, its text, history and surrounding statutory context provide no compelling evidence of legislative intent to exclude all scienter from the offense defined in section 12280(b). Section 20's generally applicable presumption that a penal law requires criminal intent or negligence, the severity of the felony punishment imposed for violation of section 12280(b), and the significant possibility innocent possessors would become subject to that weighty sanction were the statute construed as dispensing entirely with mens rea, convince us section 12280(b) was not intended to be a strict liability offense. The gravity of the public safety threat addressed in the AWCA, however, together with the substantial number of prosecutions to be expected under it and the potential difficulty of routinely proving actual knowledge on the part of defendants, convince us section 12280(b) was not intended to contain such an actual knowledge element. Consequently, we construe section 12280(b) as requiring knowledge of, or negligence in regard to, the facts making possession criminal. In a prosecution under section 12280(b), that is to say, the People bear the burden of proving the defendant *knew or reasonably should have known* the firearm possessed the characteristics bringing it within the AWCA.[11]

The question of the defendant's knowledge or negligence is, of course, for the trier of fact to determine, and depends heavily on the individual facts

---

[11]Our "reasonably should have known" formulation departs somewhat from the usual description of criminal negligence. (See, e.g., *People v. Peabody* (1975) 46 Cal.App.3d 43, 47 [119 Cal.Rptr. 780] ["[T]o constitute a criminal act the defendant's conduct must go beyond that required for civil liability and must amount to a 'gross' or 'culpable' departure from the required standard of care. [Citations.] The conduct must be aggravated or reckless . . . ."].) At issue here, however, is defendant's awareness of the characteristics of a possessed item rather than his awareness of the harmful consequences of an action. (Cf. *Simon, supra*, 9 Cal.4th at pp. 522-523 [describing the required scienter for a securities sales violation, that the defendant was "aware or should have been aware" of his misrepresentation's falsity, as requiring proof of "knowledge or criminal negligence"].) Moreover, as we have explained, the AWCA has some of the key characteristics of a public welfare offense, justifying the

establishing possession in each case. Nevertheless, we may say that in this context the Legislature presumably did not intend the possessor of an assault weapon to be exempt from the AWCA's strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics. Generally speaking, a person who has had substantial and unhindered possession of a semiautomatic firearm reasonably would be expected to know whether or not it is of a make or model listed in section 12276 or has the clearly discernable features described in section 12276.1. At the same time, any duty of reasonable inquiry must be measured by the circumstances of possession; one who was in possession for only a short time, or whose possession was merely constructive, and only secondary to that of other joint possessors, may have a viable argument for reasonable doubt as to whether he or she either knew or reasonably should have known the firearm's characteristics.

■ We further conclude the evidence here was sufficient to show, at least, negligence as to the salient characteristics. The juvenile court, examining the rifle, stated that "Russia SKS-45" was printed or engraved on a metal part near its center, forward of the stock. The police officer who found the weapon testified that the gun's magazine, though attached at the time, was detachable. The evidence the minor possessed the gun, though in conflict, was legally sufficient, as the Court of Appeal held and the minor does not now dispute. The police and probation officers' testimony was to the effect that the assault weapon was found resting on a cabinet a few feet from the bed the minor said was his. The juvenile court was entitled to accept that evidence and reject the contrary testimony from the minor and family members that only the minor's brother slept in the bunk bed. Viewed in a light favorable to the trial court's judgment (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence was sufficient for a reasonable trier of fact to find beyond a reasonable doubt that the minor's possession of the rifle, whether sole or joint, was such that he knew or should have known it was an "SKS with detachable magazine" (§ 12276, subd. (a)(11)).

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—A federal law, the National Firearms Act, prohibits the possession of an unregistered "machinegun." (26 U.S.C.

inference the Legislature intended guilt to be established by proof of a mental state slightly lower than ordinarily required for criminal liability.

§ 5845(a)(6).) California's Assault Weapons Control Act prohibits possession of an unregistered "assault weapon." (Pen. Code, § 12280.) Both laws carry a potential prison sentence. Both laws are silent on the mental state required for a violation.

In *Staples v. United States* (1994) 511 U.S. 600 [114 S.Ct. 1793, 128 L.Ed.2d 608] (*Staples*), the United States Supreme Court held that unlawful machinegun possession under the federal act required proof that the accused *knew* that a firearm had the requisite characteristics of a machinegun. Likewise, I conclude that unlawful assault weapon possession under the California act requires proof that the accused *knew* the firearm had the requisite characteristics of an assault weapon.

The majority, by contrast, holds that someone who lacks any actual knowledge that a firearm has such characteristics can nevertheless be convicted of unlawfully possessing an assault weapon. The majority does so by injecting into this criminal case a concept of civil law, namely, the negligence standard in torts, which asks whether wrongdoers "should have known" of harm resulting from their conduct.

The majority's test casts too wide a net, snaring persons who lack the culpability appropriate for imposing a state prison sentence. I cannot agree that the Legislature intended such an unfair test. I therefore dissent.

I

Enacted by our Legislature in 1989, the Assault Weapons Control Act defines as "assault weapons" certain semiautomatic rifles, pistols, and shotguns, listing them by make and model. (Pen. Code, § 12276.)[1] As relevant here, one of the listed firearms is the "SKS with detachable magazine." (§ 12276, subd. (a)(11).) A person who lawfully possessed an assault weapon before June 1, 1989, could register it with the state Department of Justice by a specified date. (§ 12285, subds. (a) and (f).) Although it is legal to possess and use a *registered* assault weapon for a variety of purposes (see § 12285, subd. (c)), possession of an *unregistered* assault weapon is a crime punishable "by imprisonment in the state prison, or in a county jail, not exceeding one year" (§ 12280, subd. (b)).

II

After admitting possession of a controlled substance, 16-year-old Jorge M. (the minor) was made a ward of the juvenile court. The court granted

---

[1]Further undesignated statutory references are to the Penal Code.

probation on conditions, among others, that the minor "not have any dangerous or deadly weapons" and that he "submit to search and seizure." Shortly thereafter, the police, accompanied by a probation officer, searched the minor's house and seized several rifles. The minor was charged with possessing firearms in violation of his probation (§ 12021, subd. (d)) and possessing an unregistered assault weapon (§ 12280, subd. (b), hereinafter section 12280(b)).

Probation officer Brian Tsubokawa testified that upon entering the house he asked the minor where he kept his "personal items," and the minor "pointed over to the bunkbed area" in a makeshift bedroom situated behind the kitchen. According to Officer Manuel Ramirez, a member of the Los Angeles Police Department's gang abatement unit, the minor said the top bunk was his. From that bunk, Ramirez seized three unloaded rifles; from the top of a nearby clothes cabinet, he recovered a fourth rifle together with an empty "banana clip," a type of detachable magazine. The latter firearm bore the markings "SKS-45" and was configured to accept a detachable magazine; it had never been registered as an assault weapon.

The minor's 22-year-old brother, Juan, testified that he, not the minor, slept on the top bunk in the makeshift bedroom. In the area where the lower bunk normally would be, Juan stored boxes. The minor slept on the floor of their sisters' bedroom. The rifles belonged to Juan and their father, an avid hunter, and were normally kept in a closet. Juan had removed the firearms from the closet to take them to a relative's house for safekeeping during the family's planned visit to Mexico to attend Juan's wedding. The mother and the minor corroborated Juan's testimony. The police found eight other rifles belonging to the minor's father elsewhere in the house.

The trial court sustained the charges, crediting the testimony of probation officer Tsubokawa that the minor had indicated he kept personal items in the bunk bed area where Officer Ramirez found the four rifles. The Court of Appeal reversed the assault weapons charge but sustained the charge of possessing firearms in violation of probation. The court found the evidence sufficient on the issue of the minor's constructive possession of the SKS rifle recovered from the makeshift bedroom to which the minor had immediate access. But the court concluded there was no evidence the minor knew the firearm had the "characteristics which brought it within the statutory definition of an assault weapon." Such knowledge, the court held, was an element of the offense. We granted the People's petition for review to determine the propriety of the Court of Appeal's holding.

III

Firmly embedded in Anglo-American criminal jurisprudence is the notion that criminal liability for a prohibited act requires a guilty or wrongful

purpose. (*United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 436 [98 S.Ct. 2864, 2873, 57 L.Ed.2d 854].) In California, this principle is codified in section 20, enacted in 1872. It states: "To CONSTITUTE CRIME THERE MUST BE A UNITY OF ACT AND INTENT. In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." Thus, under California law criminal liability rests not just on wrongful conduct, but on wrongful conduct coupled with one of two culpable mental states, either wrongful intent or criminal negligence.[2]

Wrongful intent requires either a conscious desire of a particular result or knowledge that the result is a practical certainty. (1 LaFave & Scott, Substantive Criminal Law (1986) § 3.5(a), pp. 303-304.) "So basic is this requirement that [wrongful intent] is an invariable element of every crime unless excluded expressly or by necessary implication." (*People v. Vogel* (1956) 46 Cal.2d 798, 801 [299 P.2d 850].) As the United States Supreme Court explained in *Morissette v. United States* (1952) 342 U.S. 246, 250 [72 S.Ct. 240, 243, 96 L.Ed. 288]: "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."

Criminal negligence, on the other hand, is a mental state rarely selected by legislatures as an element of a crime. It exists when an act, although unintended, is " ' "aggravated, culpable, gross, or reckless, that is, . . . such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life." ' " (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [81 Cal.Rptr.2d 835, 970 P.2d 409], quoting *People v. Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926].) This aggravated conduct sets criminal negligence apart from civil negligence, which is conduct inconsistent with that of a reasonable person in like or similar circumstances and does not require aggravated, gross, or reckless behavior. (Prosser & Keeton on Torts (5th ed. 1984) § 32, p. 175; see *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1075 [68 Cal.Rptr.2d 859, 946 P.2d 817] (conc. opn. of Kennard, J.).)

Under this latter standard, a pertinent inquiry is whether persons "knew or should have known" a particular set of facts that make their conduct unreasonable. (*Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1112, fn. 2 [56 Cal.Rptr.2d 162, 920 P.2d 1347].) Until today, no decision of this court

---

[2]In accord with common practice, I use the terms "mental state" and "mens rea" to include forms of negligence and strict liability, which do not require proof of any subjective state of mind.

has held that someone can be prosecuted under a criminal law that contains no express mental state requirement, based merely on the person's civil negligence.

The final category of offenses, those imposing *strict liability*, requires neither intent nor any form of negligence. (See 1 LaFave & Scott, Substantive Criminal Law, *supra*, § 3.8, p. 340 et seq.) As this court has explained: "The [United States] Supreme Court has indicated that regulatory or 'public welfare' offenses which dispense with any mens rea, scienter, or wrongful intent element are constitutionally permissible, but it has done so on the assumption that the conduct poses a threat to public health or safety, the penalty for those offenses is usually small, and the conviction does not do 'grave damage to an offender's reputation.'" (*People v. Simon* (1995) 9 Cal.4th 493, 519 [37 Cal.Rptr.2d 278, 886 P.2d 1271]; *People v. Vogel, supra*, 46 Cal.2d at p. 801, fn. 2.)

## IV

With this background in mind, I now turn to the question of what the Legislature intended in section 12280(b), which sets forth no mental state requirement. I noted earlier that wrongful intent, the ordinary standard for criminal liability, is the required mental state for most crimes. As I explained, this intent has been defined as the conscious desire that one's actions cause a particular result or the knowledge that the result is a practical certainty. For certain possessory crimes, this wrongful intent requires knowledge not only that the contraband item is present but also of the item's characteristics that make its possession unlawful. (See *People v. Prochnau* (1967) 251 Cal.App.2d 22, 30 [59 Cal.Rptr. 265].) There is, however, no requirement of knowledge that the law prohibits possession of the item. (§ 7, par. 5.)

California case law has not been consistent on whether knowledge is required under statutes that, in defining a possessory offense, do not mention any mental state. (Compare *People v. Williams* (1971) 5 Cal.3d 211, 215 [95 Cal.Rptr. 530, 485 P.2d 1146] [knowledge of narcotic character of the item possessed *is* essential element of possessing controlled substance] with *People v. Corkrean* (1984) 152 Cal.App.3d 35, 37-41 [199 Cal.Rptr. 375] [knowledge that gun automatically fires more than one shot *not* element of law prohibiting possession of a machinegun] and *People v. Harrison* (1969) 1 Cal.App.3d 115, 120 [81 Cal.Rptr. 396] [knowledge that firearm is loaded *not* an element of offense of carrying a loaded firearm].)

Of particular assistance here is the United States Supreme Court's recent decision in *Staples, supra*, 511 U.S. 600. That case involved a federal

firearms law that, like the California firearms law in this case, contained no express mens rea requirement. To determine whether Congress intended the defendant to "know the facts that make his conduct illegal," or intended instead to create a strict liability offense, the high court focused on two factors: The statute criminalized firearm possession, which the court described as "traditionally lawful conduct," and it provided a potential 10-year prison sentence, which the court characterized as "a severe penalty." (*Staples, supra,* 511 U.S. at pp. 605, 618-620 [114 S.Ct. at pp. 1797, 1803-1804].) These two circumstances led the court to conclude that Congress did not intend to create a strict liability offense and that therefore the defendant could not be guilty of the federal crime of possessing an unregistered machinegun unless he "knew of the features of his AR-15 that brought it within the scope of the [federal] Act." (*Id.* at p. 619 [114 S.Ct. at p. 1804].)

Application in this case of the high court's test in *Staples, supra,* 511 U.S. 600, compels the conclusion that our state Legislature did not intend the California firearms law at issue here to be a strict liability offense. As in *Staples,* the law criminalizes firearm possession, traditionally lawful conduct, and it imposes a severe penalty, a potential state prison sentence. The majority does not conclude otherwise. It observes: "[A] construction of section 12280(b) that dispenses completely with scienter may result in the severe punishment of innocent possessors, a result we do not believe the Legislature intended." (Maj. opn., *ante,* at p. 884.)

But the majority rejects the high court's further conclusion in *Staples, supra,* 511 U.S. 600, that a possessory offense that is not a strict liability crime and does not specify a mental state must require knowledge by the accused of the facts that make the act of possession illegal. The majority's holding is at odds with two recent decisions of this court, *People v. Coria* (1999) 21 Cal.4th 868 [89 Cal.Rptr.2d 650, 985 P.2d 970] (*Coria*) and *People v. Rubalcava* (2000) 23 Cal.4th 322 [96 Cal.Rptr.2d 735, 1 P.3d 52] (*Rubalcava*). In both of these decisions, this court inferred an actual-knowledge requirement for possessory offenses that had no express mental state requirement.

In *Coria,* which involved the crime of manufacturing methamphetamine, we explained: "Simply stated, there is no reason in law or logic to construe [the statute] as a strict liability offense and thus permit the conviction of a person for manufacturing methamphetamine, a felony, for extracting pseudoephedrine from pills if the person does not know the extraction was performed for the purpose of, or as part of the process of, manufacturing methamphetamine. Merely engaging in chemical synthesis is not enough; the defendant must have *knowledge* of the facts which make the chemical

synthesis unlawful, i.e., that methamphetamine is being manufactured." (*Coria, supra*, 21 Cal.4th at p. 880, italics added.)

We further noted in *Coria* that a statute's "silence with respect to a knowledge element does not mean the Legislature intended to dispense with the requirement" that the accused actually "know" the contraband character of the item possessed. (*Coria, supra*, 21 Cal.4th at p. 878.) Rather, for crimes carrying the possibility of "severe punishment" such as manufacturing methamphetamine, which is punishable by a state prison term of three, five, or seven years, the " 'usual presumption' " is that a defendant " 'must *know the facts* that make his conduct illegal.' " (*Ibid.*, quoting *Staples, supra*, 511 U.S. at p. 619 [114 S.Ct. at p. 1804], italics added.)

Just two months ago, we applied this "usual presumption" in *Rubalcava, supra*, 23 Cal.4th 322, in holding knowledge to be an element of a dangerous weapons offense, that of carrying a concealed dirk or dagger, which is punishable by up to three years in state prison. To commit the offense, we said, "the defendant must *knowingly* and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as a stabbing weapon,' " thus satisfying the statutory definition of a dirk or dagger. (*Id.* at p. 332, italics added.)

Applying the usual presumption of legislative intent as the high court did in *Staples, supra*, 511 U.S. 600, and as this court did in *Coria, supra*, 21 Cal.4th 868, and *Rubalcava, supra*, 23 Cal.4th 322, unlawful possession of an assault weapon, which carries a maximum three-year state prison sentence, requires knowledge by the defendant that the firearm has the characteristics that make it an assault weapon.

Disregarding this usual presumption, the majority injects into the offense of possession of an unregistered assault weapon a mental state taken from the civil law of torts: whether the accused "knew or reasonably should have known" the firearm possessed the characteristics that made it an assault weapon. (Maj. opn., *ante*, at p. 887, italics omitted.) That this is the test for civil negligence is not disputed by the majority (maj. opn., *ante*, at p. 887, fn. 11), which cites no decision by this court adopting this civil law standard as the requisite mental state in a criminal case.

Seeking to justify its novel imposition here of the civil negligence standard of culpability, the majority asserts that resort to this minimal standard is necessary to aid the prosecution in proving unlawful possession of an assault weapon. (Maj. opn., *ante*, at p. 885.) This assertion is both legally and factually dubious. Facilitating prosecution is not the goal of statutory interpretation, nor will requiring proof of actual knowledge unduly hamper prosecutions for unlawful assault weapons possession.

As the majority concedes, a defendant's actual knowledge that a firearm has the attributes of an assault weapon can be proven circumstantially, typically by evidence of a defendant's familiarity with firearms. (Maj. opn, *ante*, at p. 885.) The only prosecutions that are likely to be aided by the majority's "should have known" standard are those of novice firearm owners, such as a widow who inherits her husband's rifle that she has never fired or even handled. The majority's holding will facilitate her prosecution. It may not have occurred to her to examine the rifle to determine its precise make and model, the characteristics making it an assault weapon. Yet, under the majority's holding, she could now face felony conviction and state imprisonment because, in the majority's view, those characteristics are something she "should have known."

Like the Court of Appeal, I would hold that an element of the offense of possessing an unregistered assault weapon is actual knowledge by the accused that the firearm has the characteristics that make it an assault weapon. In this case, the prosecution did not prove such knowledge by the minor. Therefore, I would affirm the judgment of the Court of Appeal, reversing the assault weapons charge.

Baxter, J., concurred.

Appellant's petition for a rehearing was denied September 20, 2000.