[No. B166733. Second Dist., Div. Eight. May 17, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL THOMAS SCHAEFER, Defendant and Appellant.

## COUNSEL

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Appellant Daniel Thomas Schaefer is appealing his conviction for second degree murder and the manufacture of methamphetamine. He contends that (1) the determination of whether manufacturing methamphetamine was a seriously dangerous felony should have been made by the jury, not the trial court; (2) the jury should have been instructed that the accidental death of an accomplice did not trigger the felony-murder rule; (3) the jury should have been instructed that the principles of aiding and abetting did not apply to the firearms allegations; and (4) the trial court should have given a knowledge instruction regarding a count of possession of a short-barreled shotgun.

We find no error, and affirm.

## PROCEDURAL HISTORY

The 14-count second amended information charged appellant with murder (Pen. Code, § 187, subd. (a),[1] count 1); four counts of manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a); counts 2, 5, 9 & 13); three counts of possession of pseudoephedrine with the intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)(1); counts 3, 6 & 10); two counts of recklessly causing a fire to an inhabited structure (§ 452, subd. (b); counts 4 & 7); three counts of possession of a firearm by a felon (§ 12021, subd. (a)(1); counts 8, 11 & 14); and one count of short-barreled shotgun or rifle activity (§ 12020, subd. (a); count 12).

The information further alleged that, as to all counts, appellant had served a prior prison term (§ 667.5, subd. (b)); that as to counts 2, 5, 9, and 13, he was personally armed with a firearm (§ 12022, subd. (c)); that as to counts 9 and 10, a principal was armed with an assault weapon (§ 12022, subd. (a)(2)); and that as to counts 2, 3, 5, 6, 9, 10, and 13, he had suffered a prior drug-offense conviction (Health & Saf. Code, § 11370.2, subd. (b)).

Appellant admitted the prior prison term allegation at a bifurcated proceeding. A jury found him guilty of all the other charges except for the firearm use allegation on count 2.

Appellant was sentenced to prison for second degree murder for an indeterminate term of 15 years to life, plus a determinate term of 21 years four months for the remaining counts and allegations.

A timely notice of appeal was filed.

---

[1] All subsequent code references are to the Penal Code unless otherwise stated.

## FACTS

*Prosecution Testimony*

The process of manufacturing or "cooking" methamphetamine uses pseudoephedrine (a common cold remedy), other readily available chemicals, a solvent like alcohol or acetone, and heat. The chemicals and gases are highly volatile and flammable. An intensely hot flash fire can occur if vapors are ignited by a flame or spark.

Appellant was involved in the production of methamphetamine on different dates at different locations.

*November 14, 1999 (Counts 13 & 14)*

The police searched a barbershop on Ventura Boulevard in Tarzana after receiving a tip about a methamphetamine lab. In a back room, they found methamphetamine, pseudoephedrine, and other chemicals and equipment used in the manufacture of methamphetamine. Appellant's fingerprints were on three of the objects. Under a bed, there was paperwork in his name and in the name of an alias he used. A sawed-off shotgun was on the floor near the bed.

*June 10, 2001 (Counts 9–12)*

The police searched a home on Gledhill in North Hills after receiving an assault with a deadly weapon call regarding another occupant of the house. They discovered a methamphetamine manufacturing lab in the part of the house in which appellant lived. Among the chemicals found there were methamphetamine, pseudoephedrine, and other chemicals used in the manufacturing process. Appellant's fingerprint was on a can of Coleman fuel.

The police found numerous firearms in appellant's bedroom, including an assault weapon and a sawed-off shotgun. Appellant was a felon who was not supposed to possess firearms.

A friend of appellant's retrieved his belongings from the house, as appellant was "running from parole." The friend told the police that appellant liked guns and there were guns at his residence. At trial she did not remember making that statement, but indicated that appellant's housemate had many guns.

*June 26, 2001 (Counts 6–8)*

Jamie Escarra was a methamphetamine user who had an apartment on Valleyheart Drive in Studio City. Escarra and appellant were processing methamphetamine in the kitchen of the apartment when a flash fire occurred. Neither was injured. Appellant told the on-site building manager that a grease fire had occurred, and left the scene. An arson investigator found methamphetamine and the chemicals and paraphernalia of a methamphetamine manufacturing lab. In his opinion, the vapors from the solvents were ignited by an open flame. There was a pistol on the floor of the apartment near a bag that contained a photocopy of appellant's driver license.

*July 16, 2001 (Counts 1–4)*

Jamie Escarra was a friend of another methamphetamine user, Monica Reynoso. Escarra and Reynoso saw each other several times between June 26, 2001, and July 16, 2001. Reynoso told Escarra that she was going to let appellant cook methamphetamine at Reynoso's apartment on Vanowen Street. Escarra tried to talk Reynoso out of it, and showed Reynoso her burn-damaged apartment.

Reynoso allowed appellant to manufacture methamphetamine at her apartment on July 16. An explosion occurred in the kitchen, due to unsafe use of a flammable liquid whose vapors were ignited by an open flame. Reynoso and appellant were severely burned.[2] Reynoso died a month later from the complications of her burns. Inside the apartment, the police found methamphetamine, pseudoephedrine, and other chemicals and equipment used to manufacture methamphetamine.

*Defense Testimony*

Appellant testified in his own defense. He admitted that he had served time in prison after being convicted of possession for sale of methamphetamine.

As to the barber shop location on Ventura Boulevard, appellant admitted storing the items. He denied operating a methamphetamine laboratory at that location, or having any knowledge of the sawed-off shotgun that was found there.

---

[2] Appellant testified that he was burned over 70 percent of his body while Reynoso was burned over 62 percent of hers.

Regarding the Gledhill house, appellant admitted living in the bedroom, but denied owning any weapons there. He testified that all the weapons were owned by his housemate. Other people manufactured methamphetamine there, but all he did was help to clean up at the end of the process.

As to the incident at Escarra's apartment on June 26, appellant admitted that he was processing methamphetamine when the fire occurred.

As to the incident at Reynoso's apartment on July 16, appellant testified that he and Reynoso were working side by side in the kitchen, filtering methamphetamine, when a fire occurred. The fire was followed by an explosion.

On cross-examination, appellant admitted that he was a "huge" user of methamphetamine and had sold the drug countless times. He stated that he separated and cleaned leftover scraps of methamphetamine, but did not manufacture it. He knew that, as a parolee, he was not allowed to have guns. He denied possession of any of the guns the police found.

*Prosecution Rebuttal*

A police expert testified that from the amount of chemicals found, it was likely that appellant was manufacturing methamphetamine, rather than just processing scraps.

## DISCUSSION

1. *The Inherently Dangerous Felony Issue*

Appellant's first contention is that the trial court committed reversible federal constitutional error under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), when it refused to submit to the jury the question of whether operating a methamphetamine lab was an inherently dangerous felony.

The prosecution did not seek a conviction for first degree murder. It relied solely on the felony-murder rule as its theory for appellant's liability for second degree murder. For that rule to apply, it was necessary that the underlying felony be a felony that was inherently dangerous to human life.

(*People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*).)

Appellant argued below, as on appeal, that *Apprendi* gave him a due process right to have the jury determine whether manufacturing methamphetamine was an inherently dangerous felony. The trial court found that even after *Apprendi*, it was appropriate to follow *People v. James* (1998) 62 Cal.App.4th 244 [74 Cal.Rptr.2d 7] (*James*), under which manufacturing methamphetamine is an inherently dangerous felony as a matter of law.

The jury was instructed: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of [*sic*] as the direct causal result of the crime of Manufacturing Methamphetamine in violation of Health and Safety Code Section 11379.6(a) is murder of the second degree when the perpetrator had the specific intent to commit that crime. [¶] The specific intent to commit the crime of Manufacturing Methamphetamine and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." In the other instructions that were given, the jury was fully instructed on the law of causation and the elements of the crime of manufacturing methamphetamine.

We find that the trial court was correct in not leaving the inherently dangerous felony question for the jury.

■ In determining whether a felony is inherently dangerous, a court looks to the elements of the felony in the abstract. The test is whether the felony is one which, by its very nature, cannot be committed without creating a substantial risk that someone will be killed. An equivalent and interchangeable definition is that the commission of the felony must carry a high probability that death will result. (*Hansen, supra*, 9 Cal.4th at p. 309; *James, supra*, 62 Cal.App.4th at pp. 258–259.)

■ *James* held that manufacturing methamphetamine is an inherently dangerous felony because the nature of the crime means that it cannot be committed without a substantial risk that someone will be killed. (*James, supra*, 62 Cal.App.4th at pp. 270–271.) The defendant there was manufacturing methamphetamine when a fire occurred, which destroyed her trailer home and killed her three youngest children. In making its ruling, *James* carefully analyzed the hazards in the methamphetamine manufacturing process as well as prior cases which discussed those dangers.

Although *James* was decided prior to *Apprendi*, another portion of the *James* opinion analyzed an issue similar to *Apprendi*. The defendant argued that instructing the jury that manufacturing methamphetamine was an inherently dangerous felony violated due process by removing that issue from the jury's consideration. (*James, supra,* 62 Cal.App.4th at pp. 271–274.) In rejecting that contention, *James* explained that the due process clause requires that the prosecution prove beyond a reasonable doubt every fact that is necessary to constitute the crime. The due process clause does not preclude instructing the jurors that manufacturing methamphetamine is an inherently dangerous felony as a matter of law. "They still had to find every factual element of the crime, including whether defendant's conduct constituted the felony of manufacturing methamphetamine, and whether her children's deaths occurred during or as a direct causal result of the commission or attempted commission of this felony." (*Id.* at p. 273.)

This instructional aspect of *James* was approvingly cited by Division Four of this court in another pre-*Apprendi* case, *People v. Avanessian* (1999) 76 Cal.App.4th 635, 645 [90 Cal.Rptr.2d 367] (*Avanessian*), which involved forged smog certificates. *Avanessian* held that the trial court properly instructed the jury that smog certificates fell within the meaning of the pertinent Vehicle Code section, as that was a question of law. The instruction did not impinge on the defendant's constitutional rights. The jury still had to find that the elements of the crime had been established, which included determining that the particular exhibits introduced by the prosecutor were smog certificates. (*Id.* at pp. 644–645.)

*Apprendi, supra,* 530 U.S. 466, does not compel a change in the persuasive analysis of *James* and *Avanessian,* which permits a trial court to determine a question of law. *Apprendi* held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) Based on the due process clause of the Fourteenth Amendment, the Supreme Court invalidated a New Jersey statute which provided an extended prison term if, after a jury's verdict, the trial judge found by a preponderance of the evidence that the crime was committed as a hate crime. The constitutional protections of due process, right to a jury and proof beyond a reasonable doubt were held to apply equally both to the underlying offense and to the additional penalty which was imposed for committing the hate crime. (*Apprendi, supra,* at pp. 476–477.)

██ We see nothing in *Apprendi* to change the long-standing rule that it is a question of law whether a crime is an inherently dangerous felony for the purpose of the felony-murder rule. (*Hansen, supra,* 9 Cal.4th at p. 309; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 180.)

██ "Once a published appellate opinion holds a felony is (or is not) inherently dangerous, that precedent is controlling, unless and until a litigant makes an offer of proof that technological changes have changed the status of the felony. This ensures that the classification of felonies as inherently dangerous is governed by a uniform rule of law." (*James, supra,* 62 Cal.App.4th at p. 263.) *James*'s holding resolved a question of law, whether manufacture of methamphetamine is a seriously dangerous felony. *Apprendi* was concerned with a contested issue of fact, whether the defendant had the requisite mental state for a hate crime. The trial court here correctly relied on *James* and was not required by *Apprendi* to submit the inherently dangerous felony issue to the jury.

### 2. Accidental Death of an Accomplice Triggers the Felony-murder Rule

Appellant maintains that the trial court committed federal constitutional error in refusing to instruct the jury that the felony-murder rule did not apply to an accomplice who accidentally killed herself during the manufacture of methamphetamine. This issue was resolved adversely to appellant in *People v. Billa* (2003) 31 Cal.4th 1064 [6 Cal.Rptr.3d 425, 79 P.3d 542] (*Billa*), which was pending at the time of trial.

The facts in *Billa* were that the defendant and two others conspired to burn the defendant's truck for the purpose of insurance fraud. All three conspirators were present at the scene of the burning. One of the conspirators caught fire and burned to death. The defendant argued that the felony-murder rule should not apply as the conspirator had caused his own death and his death was not in furtherance of the conspiracy. Rejecting that contention, the *Billa* court reasoned that making arsonists liable for murder of anyone, including an accomplice, who died during the crime provided an incentive for them to do whatever was necessary to ensure that nobody died. (*Billa, supra,* 31 Cal.4th at p. 1070.) "One may have less sympathy for an arsonist who dies in the fire he is helping to set than for innocents who die in the same fire, but an accomplice's participation in a felony does not make his life forfeit or compel

society to give up all interest in his survival." (*Ibid.*) Moreover, the conspirators were acting in furtherance of the conspiracy when they committed the acts that resulted in the conspirator's death, even though the death itself was an unintended result that was opposed to the conspiracy. (*Id.* at p. 1071.) The court, therefore, held that "felony-murder liability for any death in the course of arson attaches to all accomplices in the felony at least where, as here, one or more surviving accomplices were present at the scene and active participants in the crime." (*Id.* at p. 1072.)

◼    Appellant's opening brief, which was filed prior to the *Billa* decision, relies on *People v. Ferlin* (1928) 203 Cal. 587 [265 P. 230], and its progeny. *Ferlin* held that the felony-murder rule did not apply to a defendant who arranged for an arson fire but was not at the scene when the coconspirator was burned. *Billa* criticized *Ferlin* and, without overruling it, limited *Ferlin* to the situation where the defendant was never at the scene of the fire. (*Billa*, *supra*, 31 Cal.4th at p. 1066.) Here, of course, Reynoso and appellant were at the scene together, actively participating in the underlying crime. In his reply brief, appellant makes the only argument that remains to him after *Billa*, which is that *Billa* should not apply because the crime here is manufacture of methamphetamine rather than arson. Since the rationale of *Billa* makes sense as to either crime, the felony-murder rule was properly applied in determining appellant's culpability for Reynoso's death.

### 3. *Aiding and Abetting and the Deadly Weapon Allegations*

Appellant argues that the trial court committed federal constitutional error when it failed to inform the jurors that, in order to sustain the gun charges and find the gun enhancements true, appellant needed to do more than aid and abet another person's possession of or arming with a firearm. He maintains the jury may have been confused because the court gave CALJIC No. 3.00, which told them that principals were those "who directly and actively commit the act constituting the crime, or [¶] . . . who aid and abet the commission of the crime." According to appellant, the jurors "could have found that an accomplice during the manufacture was personally armed, and held appellant 'equally' liable for that arming with respect to the charges and allegations as an aider and abettor."

This contention lacks merit. The jury was properly instructed on the elements of the weapons charges. The prosecutor argued that appellant possessed all of the guns or, if the jury believed his testimony that he was

keeping his housemate's guns in his bedroom, at least jointly possessed them. Appellant testified that none of the guns were his. The principles of aiding and abetting had nothing to do with the gun charges here.

### 4. *The Absence of a Knowledge Instruction on the Short-barreled Rifle Count*

■ Count 12 of the information charged appellant with a June 10, 2001 violation of section 12020, subdivision (a), which punishes any person who possesses a "short-barreled shotgun." The statute does not specify a requisite mental state. However, penal statutes are often construed to have some type of mens rea requirement, even though the statute does not express one. (*In re Jorge M.* (2000) 23 Cal.4th 866, 872 [98 Cal.Rptr.2d 466, 4 P.3d 297] *(Jorge M.)*; *People v. Simon* (1995) 9 Cal.4th 493, 521–522 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) Due process concerns may be implicated if a significant penalty is involved and a statute is construed as a strict liability criminal offense. (*People v. Simon, supra,* at p. 522.)

The instruction for this charge did not include any mental state. The jury was told, in relevant part: "Defendant is accused in Count Twelve of having violated section 12020, subdivision (a) of the Penal Code, a crime. [¶] Every person who possesses a short-barreled shotgun is in violation of Penal Code section 12020, subdivision (a). [¶] . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person possessed a short[-]barreled shotgun. A short-barelled [*sic*] shotgun is defined as a shotgun having a barrel or barrels less than eighteen inches in length."

As recognized but not resolved in *Jorge M., supra,* 23 Cal.4th at pages 876 and 878, the law is currently unsettled over whether a knowledge requirement should be read into section 12020, subdivision (a). We need not resolve that issue, because there is no doubt that appellant knew he possessed a short-barreled shotgun.

"[S]awed-off shotguns . . . are so easily distinguishable, and so patently tailored to criminal activity, that unknowing and innocent possession is unlikely." (*Jorge M., supra,* 23 Cal.4th at p. 878.)

■ Section 12020, subdivision (c)(1) defines a "short-barreled shotgun" in terms of a barrel of less than 18 inches in length. A criminalist told the jury that a shotgun barrel should be 18 inches in length. The sawed-off shotgun in question had a barrel length of seven and one-eighth inches, almost 11 inches too short. The jury could compare that weapon with other weapons, which were not sawed off. It knew from the abundance of firearms in this case that appellant was familiar with such weapons. Any instructional error was

harmless beyond a reasonable doubt, because no rational jury would have found that knowledge was unproven. (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 416 [124 Cal.Rptr.2d 92]; *Neder v. United States* (1999) 527 U.S. 1, 19 [144 L.Ed.2d 35, 119 S.Ct. 1827].)

## DISPOSITION

The judgment is affirmed.

Rubin, Acting P. J., and Boland, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 15, 2004.