[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 256 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 257 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 258 
OPINION
Defendant and appellant, Ethan Saleem, appeals the judgment entered following his conviction for possession of body armor by a person previously convicted of a violent felony, with prior serious felony and prior prison term findings (Pen. Code, §§ 12370, 667, subds. (b)-(i), 667.5).[1] He was sentenced to state prison for a term of eight years.
We reverse Saleem's conviction. Section 12370 is unconstitutionally void for vagueness because it does not provide fair notice of which protective body vests constitute the body armor made illegal by the statute.
 BACKGROUND
Viewed in accordance with the usual rule of appellate review (People v. Ochoa (1993) 6 Cal.4th 1199, 1206
[26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following. *Page 259 
1. Saleem's arrest.
On January 23, 2007, about 3:00 a.m., Los Angeles Police Officer Jeffrey Rivera and his partner were on patrol in Wilmington. Rivera was in the passenger seat of their marked patrol car. He saw an approaching vehicle make a quick right turn and pull off to the side of the road. Because this seemed suspicious, the officers circled the block and came to a stop next to a Honda Element. The Honda's engine was running and it was parked just about where Rivera had seen the vehicle pull over. Shining their lights on the Honda, the officers saw the driver try to hide himself by reclining his seat. Two people in the backseat suddenly popped into view and one of them started reaching underneath the car seat. This was defendant Saleem. Rivera ordered everyone to exit the Honda.
Saleem did not immediately respond and Rivera had to repeat his order four or five times. After he got out of the Honda, Saleem had to be told three or four more times to step onto the curb with his hands up. When Saleem began walking away from the officers, Rivera again ordered him to put his hands up and turn around. Saleem took five or six steps, then stopped and turned around. At that point, Rivera could see Saleem was wearing "a camouflage vest" similar to the "ballistic" or "bulletproof vests Rivera had worn while he was deployed in Iraq with the Marines. Over the vest, Saleem was wearing an unbuttoned shirt.
As a matter of officer safety, Rivera immediately alerted his partner to Saleem's vest. Both officers drew their guns, pointed them at Saleem, and ordered him to the ground. Saleem complied with this order only after it had been repeated two or three times. Finally, he got down on his knees and put his hands up. Rivera searched under the seat where he had seen Saleem reaching, but he did not find anything illegal. Saleem told the officers he was on parole for voluntary manslaughter.
2. Officer Rivera's testimony about the vest.
Rivera testified Saleem's vest weighed about 10 pounds. A label on the vest said "[b]ody armor, fragmentation protection vest for ground troops." Behind the label was a pamphlet addressing "the use and care of body armor fragmentation protection vest, ground troops. . . ."
During his time in the military, Rivera had participated in the testing of flak jackets similar to Saleem's body vest: "[T]he vest was placed on a dummy, and we were able to fire various types of rounds at [it], and we were also able to observe the different capabilities of the vest and what rounds it's able to withstand." Based on that experience, Rivera opined Saleem's vest would protect against pistol rounds, such as .22, .38, .40 and .45 caliber, and nine millimeter. *Page 260 
3. The body armor expert's testimony about the vest.
Los Angeles Police Officer Richard Kehr, a subject matter expert in ballistics and body armor, is one of 20 people nationwide on the Body Armor Technology Working Group for the National Institute of Justice (NIJ), a federal organization concerned with standards and testing procedures for ballistics and body armor. Kehr testified the NIJ currently recognizes four basic levels of body armor protection and that the Working Group was in the process of raising the NIJ minimum standards.
Kehr testified the protection provided by any particular body armor depends on such factors as the number of its layers of protective material, its stitch pattern, its weave pattern, and the "type of rounds they're trying to stop. . . ." Concealable body armor is designed to stop handgun fire but not rifle rounds, which require a hard armor plate. Kehr testified the testing of body armor is a very technical process that is not as simple as shooting at a dummy wearing a vest: "When it comes to the actual testing of the body armor, we have that done either at NIST [National Institute of Standards and Technology] or at . . . two independent test labs. 1 don't have the [facility] and means to do the ballistic testing at our department. . . . To test body armor you have to have a special type of clay, it has to be certain size box, it has to be at a certain temperature and humidity, and then you have to calibrate it before you can test it." "They do six shot tests on it, four shots done directly straight into it and two of them are done at a 30 degree angle. After each shot, they measure the back face signature . . . [i.e.,] the amount of dent that goes into the clay from after the round hits. The maximum amount allowed is 44 millimeters. Anything outside the 44 millimeters is considered a . . . vest failure."
Kehr initially examined Saleem's vest without cutting it open. He checked its weight and the flexibility of its interior material. He testified the vest was "fairly heavy compared to a standard concealable body armor, it's pretty rigid. Usually . . . the more rigid the vest is, the higher the threat it can stop. This vest is a fragmentation vest. Fragmentation vests are designed to stop shrapnel you have usually from IED's,[2] mines, grenades, things of that nature, and typically they're designed just to do that and not to stop ballistic ammunition, handgun rounds. [¶] But by the weight of this vest and everything, I believe that there are certain rounds that it would be able to stop, without a problem."
Kehr also testified about what he found when he subsequently cut open the lining of the vest to examine its insides: "It confirmed my belief that this vest *Page 261 
would have some ballistic capabilities. It's got eight layers of an aramid material. . . . [¶] . . . Kevlar is an aramid material. The rigidity on there, the type of pattern on the weave, looks consistent to other materials that I have seen and examined. And based on that, I believe it has some ballistic capabilities."
As for the vest's ability to protect against specific types of ammunition, Kehr explained how such factors as a bullet's composition, shape, weight, jacketing, and velocity will determine a body vest's degree of ballistic resistance. For example, discussing whether Saleem's vest would resist .22-caliber ammunition, Kehr testified: ".22 caliber [long rifle high velocity] bullets are 40 grain, a lot of them are made of lead. Lead being soft, it's easy to mushroom out. [¶] . . . [T]he design of body armor is to take a round and deform it, mushroom it out, making it a wider surface area. The wider surface area, the harder it is to get through and break the tensile strength of the micro filament. Lead being soft, it will mushroom out .22-caliber long rifle rounds ranging anywhere from 1,050 feet per second up to approximately 1,550 to 1,600 feet per second. [¶] 22 magnum rounds, they're usually around 1,875 feet per second. I doubt seriously this vest would be able to stop that type of ammunition. Those have usually a metal jacket around it. Even though it's a 40 grain, it will maintain its shape and keep its roundness. [¶] Ammunition comes in various designs, some are hollow point, some are round nose, some are flat nose. With that type of round, at that velocity, maintaining its shape, I seriously doubt this vest would be able to stop that."
Kehr opined Saleem's vest would protect against .22-caliber long rifle high velocity rounds, .38-caliber hollow-point rounds, jacketed soft point .357 Magnum rounds, nine-millimeter rounds and .45-caliber hollow-point rounds. However, Saleem's vest would not protect against two other types of handgun ammunition: a .22-caliber Magnum round with a metal jacket, or a full metal jacket .357 Magnum round. Nor would it protect against rifle ammunition. The following colloquy then occurred:
"Q Officer Kehr, does this vest meet your definition, the definition you understand as an expert . . . in the field of body armor, does this vest meet your definition of what body armor is?
"A It has some capabilities for a bullet resistant vest, yes."
Kehr testified the pamphlet found inside Saleem's vest stated: "This vest does not protect you against small armsfire. It may tend to decrease the severity of wounds . . . from rifles and machine guns and will sometimes stop small arms fire that hit from an angle, or if the slug has low velocity." (Italics added.) Kehr testified the pamphlet did not change his opinion that Saleem's *Page 262 
vest provided some ballistic resistance because, in military parlance, "small arms fire" refers to machine gun and rifle fire. "[E]ven though technically handguns are part of small arms fire, . . . it's not considered as part of it, the handguns. The military usually refers to small arms fire as machine guns and rifles."
On cross-examination, Kehr again acknowledged Saleem's vest was a "flak jacket" designed to stop shrapnel. Although it might have "some ballistic capabilities," that is not what it was designed for. The following colloquy also occurred:
"Q [W]hen you looked at this booklet [i.e., the pamphlet found inside Saleem's vest] and told us that this vest does not protect you against small arms fire, you formed the opinion that there was still some small arms fire that it could protect you from like the .22 caliber?
"A Yes, ma'am.
"Q Okay. So despite the fact that that book[let] says this does not stop small arms fire, you believe that it does?
"A Yes.
"Q And this belief is just based upon your years of training and experience?
"A Yes, ma'am.
"Q And this belief is based upon the fact that you were able to cut open the jacket and look through the layers of material; is that correct?
"A Yes."
 CONTENTIONS
1. Saleem contends there was insufficient evidence his protective vest constituted "body armor" under section 12370.
2. Saleem also contends section 12370 is unconstitutionally void for vagueness. *Page 263 
 DISCUSSION 1. There was sufficient evidence Saleem's vest constituted body armor.
a. The prohibition of section 12370.
Section 12370 outlaws the possession of body armor by a person previously convicted of a violent felony. In defining body armor, the statute specifically references the California Code of Regulations by providing, as relevant here: "Any person who has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5, . . . who purchases, owns, or possesses body armor, as defined by Section 942 of Title 11 of the California Code of Regulations . . . is guilty of a felony. . . ." (§ 12370, subd. (a).) The referenced portion of the California Code of Regulations sets out a detailed scheme establishing minimum technical standards for the certification of body armor to be purchased for law enforcement personnel.
Section 941 of the California Code of Regulations states: "This article shall apply to body armor (formerly referred to as bulletproof vests) to be purchased for State law enforcement officers and shall establish minimum requirements and testing methods to ensure ballistic resistance for certification purposes. Police body armor submitted by manufacturers for certification by the Department of Justice shall meet the minimum standards specified in these regulations." (Cal. Code Regs., tit. 11, § 941.) Section 942 of the regulations states: "Wherever these terms are used in this article, the following definitions shall apply: [¶] . . . [¶] (e) Body Armor. `Body armor' is popularly called a `bulletproof vest'. For purposes of these regulations, `body armor' meansthose parts of a complete armor that provide ballisticresistance to the penetration of the test ammunition for which acomplete armor is certified. . . ." (Cal. Code Regs., tit. 11, § 942, subd. (e), italics added.)
Subsequent sections of the California Code of Regulations set out the "minimum requirements and testing methods" to be employed in ascertaining "ballistic resistance for certification purposes." (Cal. Code Regs., tit. 11, § 941.) If body armor meets the requirements for configuration, workmanship and labeling, it is then tested for ballistic protection: "Body armor shall protect against the standard test rounds specified in Section 946 of this title. It shall also provide protection against the lesser threats listed in Table 1 for Type I, such as 12 gauge 00 buckshot, 22 caliber Long Rifle, High Velocity, 38 Special, and most other factory loads in 357 Magnum and 9 mm rounds." (Cal. Code Regs., tit. 11, § 945, subd. (e).) The regulations specify particular equipment and supplies to be used in the testing. (Cal. Code Regs., tit. 11, § 946.) For instance, use of a chronograph is specified, which the regulations *Page 264 
explain is "an instrument that times projectiles in flight" and "consists of triggering screens and electronic time measurement controls." (Cal. Code Regs., tit. 11, § 942, subd. (g).) The specific test ammunition to be used is set out in the margin.[3]
 b. No requirement the proscribed vest be previously certified.
Saleem contends his conviction must be set aside because a violation of section 12370 required evidence his protective body vest had been certified as body armor, under the testing regimen specified by the California Code of Regulations, and the People presented no such evidence.
We reject this claim because the plain meaning of the foregoing provisions is that the proscribed vest need not have been previously certified in order for its possession to violate section 12370. Rather, the statute prohibits possession of a body vest that meets the certification requirements set forth in the regulations. Applied here, this only required proof the vest Saleem wore was equivalent to, or better than, body armor that is certified for sale to law enforcement. Thus, although certification is required before body armor may be purchased for law enforcement, certification is not an element of asection 12370 violation. *Page 265 
 c. Reliance on Chapple for prior certification misplaced.
Saleem relies on People v. Chapple (2006)138 Cal.App.4th 540 [41 Cal.Rptr.3d 680]. But Chapple did not hold section 12370 only applies to a vest that has been previously certified. In Chapple, the only testimony regarding the ballistic capability of the vest was provided by the arresting officer. Rejecting the People's argument "that bulletproof vests, like firearms, are sufficiently within common experience to be identified at trial by lay witnesses,"Chapple held the question whether the vest constituted prohibited body armor could only be decided by experttestimony. (People v. Chapple, supra, at p. 548.) In the course of its discussion, Chapple said, "The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.'" (Id. at pp. 548-549.) However, this statement was not part of Chapple's holding that lay opinion is insufficient to support a conviction for possessing body armor. Moreover, in the very next sentence,Chapple indicated the prosecutor need only show that "the vest seized in this case met such certification standards. . . ." (Id. at p. 549.) To whatever extentChapple may be read as requiring the prosecutor to prove the vest already has been certified for purchase by law enforcement, we disagree.
d. Legislative history does not support this argument.
The legislative history of section 12370 indicates the Legislature was concerned about "the tide of recent criminal incidents which create [sic] a dangerously threatening environment for both police officers and citizens," because violent perpetrators were wearing body armor. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 1.) Nothing indicates the statute was meant to address only body armor that had already been certified. Indeed, limiting application of the statute to already certified body armor would frustrate the purpose of the legislation by decriminalizing possession of uncertified body armor, regardless of its ballistic capabilities. Such a construction would permit a criminal to avoid the proscription of the statute merely by using uncertified body armor. All the statute requires is that the defendant's protective body vest meets the certification standards.
Hence, we reject Saleem's claim his conviction must be reversed because there was no evidence the vest he possessed already had been certified under the testing regimen set forth in the California Code of Regulations.
2. Section 12370 is void for vagueness.
Saleem contends section 12370 is void for vagueness because it failed to provide fair notice that his body vest was illegal. We agree. *Page 266 
a. The void for vagueness doctrine.
"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.] Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine `is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement.' [Citation.] Where the legislature fails to provide such minimal guidelines, a criminal statute may permit `a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' [Citation.]" (Kolender v. Lawson (1983) 461 U.S. 352, 357-358, fn. omitted [75 L.Ed.2d 903, 103 S.Ct. 1855].)
"[T]he underlying concern [of the void for vagueness doctrine] is the core due process requirement of adequatenotice." (People ex rel. Callo v. Acuna (1997)14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596].) "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]" (Connolly v. General Const. Co. (1926) 269 U.S. 385,391 [70 L.Ed. 322, 46 S.Ct. 126].) "A law failing to give aperson of ordinary intelligence a reasonable opportunity to knowwhat is prohibited violates due process under both the federaland California Constitutions." (Kasler v. Lockyer
(2000) 23 Cal.4th 472, 498-499 [97 Cal.Rptr.2d 334, 2 P.3d 581], italics added.)
b. Section 12370's knowledge requirement.
We already have concluded, ante, that neither prior certification of the body vest, nor prior testing, pursuant to the technical specifications contained in title 11 of the California Code of Regulations, is an element of the criminal offense set forth in section 12370. However, as we explain, a necessary element of the offense is either actual knowledge of, or negligence with regard to, the facts making possession of a particular body vest illegal under the statute.
Section 12370 does not contain an explicit knowledge element. This does not mean the Legislature did not intend to require one, however. "As a *Page 267 
general rule, no crime is committed unless there is a union of act and either wrongful intent or criminal negligence. [Citations.] This rule, which is `firmly embedded' in `"the principles of Anglo-American criminal jurisprudence"' [citation] is so basic that wrongful intent or criminal negligence `is an invariable element of every crime unless excluded expressly or by necessary implication' [citations] and `penal statutes will often be construed to contain such an element despite their failure expressly to state it' [citations]." (People v.King (2006) 38 Cal.4th 617, 622-623 [42 Cal.Rptr.3d 743,133 P.3d 636].) Courts have been "justifiably reluctant" to construe offenses carrying substantial penalties as strict liability offenses where dispensing with mens rea would "`require the defendant to have knowledge only of traditionally lawful conduct.'" (In re Jorge M. (2000)23 Cal.4th 866, 881 [98 Cal.Rptr.2d 466, 4 P.3d 297].) "The prevailing trend in the law is against imposing criminal liability without proof of some mental state where the statute does not evidence the Legislature's intent to impose strict liability." (In reJennings (2004) 34 Cal.4th 254, 267 [17 Cal.Rptr.3d 645,95 P.3d 906].) Indeed, "at least where the penalties imposed are substantial, section 20[4] can fairly be said to establish a presumption against criminal liability without mental fault or negligence, rebuttable only by compelling evidence of legislative intent to dispense with mens rea entirely." (Inre Jorge M., supra, at p. 879.)
c. Public welfare exception does not apply.
An exception exists for public welfare offenses, crimes involving "the violation of statutes that are purely regulatory in nature and seek to protect the health and safety of the public." (People v. King, supra, 38 Cal.4th at p. 623.) "`"Under many statutes enacted for the protection of the public health and safety, e.g., traffic and food and drug regulations, criminal sanctions are relied upon even if there is no wrongful intent."'" (In re Jorge M., supra,23 Cal.4th at p. 872.) Public welfare offenses usually involve light penalties and "`"no moral obloquy or damage to reputation"`" (Peoplev. King, supra, at p. 623), and the statutory purpose is regulation rather than punishment. "`"The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement."'" (Ibid.)
In re Jorge M., supra, 23 Cal.4th 866, is instructive. There, a juvenile was found in possession of an unregistered assault weapon in violation of section 12280, a provision contained in the Roberti-Roos Assault Weapons Control Act of 1989 (§ 12275 et seq.; AWCA). He contended there was insufficient evidence he knew the gun had the characteristics of an assault weapon for which registration was required. After considering a variety of relevant *Page 268 
factors, Jorge M. concluded that, although the AWCA was a "remedial law aimed at protecting the public against a highly serious danger to life and safety" (In re Jorge M.,supra, at p. 880), the crime was not a public welfare offense. The court concluded the Legislature intended "a degree of scienter regarding the character of the firearm"; otherwise, there was too great a risk of severely punishing innocent possession. (Id. at p. 885.) However, effective enforcement of the law demanded the prosecution need only show the defendant knew, or reasonably should haveknown, the firearm had characteristics bringing it within the AWCA. "To require more — especially to require knowledge of the law as the amici curiae propose — would seriously impede effective enforcement of the AWCA, contrary to the legislative intent." (23 Cal.4th at p. 886.)
Hence, actual knowledge regarding the firearm's prohibited characteristics was not an element; it was sufficient that the defendant should have known about the prohibited characteristics. The Legislature "presumably did not intend the possessor of an assault weapon to be exempt from the AWCA's strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics." (In re Jorge M., supra,23 Cal.4th at p. 888.)
In the case at bar, the People appropriately do not argue section 12370 is a public welfare offense. Section 12370 is not akin to a regulatory traffic or food and drug statute. Violation of section 12370 is a felony punishable by a prison term of between 16 months and three years. Thus, the penalty for the crime is not light and a conviction is not free from moral obloquy. (See In re Jorge M., supra,23 Cal.4th at p. 873 [damage to reputation necessarily attaches to felony conviction]; see also Staples v. United States (1994)511 U.S. 600, 616 [128 L.Ed.2d 608, 114 S.Ct. 1793] [historically, "the small penalties attached to [public welfare] offenses logically complemented the absence of a mensrea requirement . . ."].) Although there is no bright-line rule regarding punishment for public welfare offenses, the Legislature's choice to categorize violation of section 12370 as a felony, and prescribe significant prison terms upon conviction, "reinforces the presumption expressed by section 20 and suggests that correspondingly strong evidence of legislative intent is required to exclude mens rea from the offense." (In re Jorge M., supra, at p. 880.)
The available legislative history of section 12370 contains no discussion of a knowledge element, nor does it contain any compelling evidence that the Legislature intended to dispense with one. Further, nothing meaningfully differentiates section 12370's prohibition on body armor by a violent felon from other similar prohibitions on dangerous items, for which a knowledge element typically has been required. (See, e.g., People v.King, supra, *Page 269 38 Cal.4th at pp. 627-628 [short-barreled rifle]; In re JorgeM., supra, 23 Cal.4th at p. 887 [unregistered assault weapon]; People v. Rubalcava (2000) 23 Cal.4th 322,331-332 [96 Cal.Rptr.2d 735, 1 P.3d 52] [dirk or dagger];People v. Westlund (2001) 87 Cal.App.4th 652, 658
[104 Cal.Rptr.2d 712] [firearm silencer].)
d. Elements of section 12370's knowledge requirement.
Having concluded section 12370 must be construed to contain a knowledge element, we next address the question of precisely what that element entails. Crimes involving possession of contraband typically require proof of two types of knowledge: (1) knowledge that one actually possesses the item in question, and (2) knowledge of those characteristics making the item illegal.
First, the defendant must know he or she is actually in possession of the allegedly prohibited item. (See, e.g.,People v. Rubalcava, supra, 23 Cal.4th at p. 332, fn. 6 [where statute prohibited possession of a dirk or dagger: "[A] person could slip a knife into a defendant's pocket without his [or her] knowledge or give a defendant a fixed-blade knife wrapped in a paper towel, but tell the defendant the knife has a folding blade that cannot lock. In these cases, the defendant would lack the necessary mens rea."].) Here, the prosecution had to prove Saleem knew he was in possession of the body vest.
Second, the defendant must know, or reasonably should have known, the characteristics of the item possessed that make it illegal. (Sec, e.g., In re Jorge M., supra,23 Cal.4th at p. 887 [where issue is illegal possession of assault weapon, People must prove defendant knew or reasonably should have known "the firearm possessed the characteristics bringing it within the AWCA"]; People v. King, supra, 38 Cal.4th at p. 627
[in prosecution for possession of short-barreled rifle, People must prove defendant "knew the rifle was unusually short, but the defendant need not know the rifle's actual dimensions"];People v. Rubalcava, supra, 23 Cal.4th at p. 332 [in prosecution for carrying concealed dirk or dagger, defendant must know weapon can be used for stabbing].)
Hence, the prosecution had to prove Saleem knew, or reasonably should have known, the body vest in his possession had characteristics making it illegal under section 12370.
e. Section 12370 is void for vagueness.
Saleem argues section 12370 is unconstitutionally void for vagueness because its definition of body armor did not give him fair notice of the *Page 270 
characteristics making his body vest illegal. "[I]n determining whether the relevant language [of the challenged statute] is sufficiently certain to meet the constitutional requirement of fair notice, `we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing the statutory language.'" (People v.Heitzman (1994) 9 Cal.4th 189, 200 [37 Cal.Rptr.2d 236,886 P.2d 1229].) As judged by each one of these three factors, section 12370 is manifestly void for vagueness.
(1) Language of the statute.
Section 12370, subdivision (a), provides that violent felons who possess "body armor, as defined by Section 942
of Title 11 of the California Code of Regulations" are guilty of a felony. (Italics added.) Section 942 of the regulations, which contains a list of definitions, states: "Wherever these terms are used in this article, the following definitions shall apply. . . ." (Cal. Code Regs., tit. 11, § 942.) Subdivision (e) of section 942 of the regulations defines body armor. It states: "`Body armor' is popularly called a `bulletproof vest'.For purposes of these regulations, `body armor' means
those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified. . . ." (Cal. Code Regs., tit.11, § 942, subd. (e), italics added.)
We believe the plain meaning of these two intersecting provisions is dictated by the two italicized phrases. Section 12370 relies on the regulations to define the prohibited item, and the second sentence of California Code of Regulations, title 1.1, section 942, subdivision (e), supplies that definition. We read the first sentence of subdivision (e) as merely giving a general introductory characterization to the term "body armor," and the second sentence as providing the actual definition. We do not believe the first sentence of subdivision (e) purports to define body armor as any garment popularly known as a bulletproof vest. If it did, it would render the entire second sentence meaningless. Hence, the body armor proscribed by section 12370 is not just any garment popularly known as a bulletproof vest. Given the detailed technical specifications spelled out in the California Code of Regulations, and specifically referenced by section 12370, the proscribed body armor must be some subset of the category garments "popularly called bulletproof vests."
The Attorney General tries to resist this reading of California Code of Regulations, title 11, section 942, subdivision (e), by asserting that "`body armor' is defined . . . using a phrase of common knowledge: a bulletproof vest." However, during the course of his appellate brief, the Attorney General sometimes reads this language much more narrowly. Thus, he says section 12370 "criminalizes possession of what is commonly known as a bulletproof *Page 271 
vest, or more specifically, an item that provides ballistic resistance to the types of bullets used to certify body armor for purchase by law enforcement." (Italics added.) And again: "[A]ccording to the plain language of the statute, `body armor' is any piece of a complete armor that provides ballistic resistance to the type of ammunition used in the testing done to certify body armor for purchase by law enforcement pursuant to Article 1."
Sometimes the Attorney General tries to read this language both broadly and narrowly at the same time: "Section 12370, subdivision (a), read in context with section 942 of the Regulations, provides a clear definition of `body armor' as being an item first and foremost that is popularly known as a `bulletproof vest.' As such a term is clearly within the common knowledge, there is nothing vague about the law. Further, the law clarifies that `body armor' is an item that provides ballistic resistance to the types of ammunition used to test body armor in the certification process."
This attempt to promote the importance of the first sentence in California Code of Regulations, title 11, section 942, subdivision (e), at the expense of the second sentence, contradicts two maxims of statutory construction. "First, in reviewing the text of a statute, we must follow the fundamental rule of statutory construction that requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary." (People v.Arias (2008) 45 Cal.4th 169, 180 [85 Cal.Rptr.3d 1,195 P.3d 103].) "A second principle of statutory construction explains that, when a particular class of things modifies general words, those general words are construed as applying only to things of the same nature or class as those enumerated. [Citation.] This canon of statutory construction, which in the law is known as ejusdem generis, `"applies whether the specific words follow general words in a statute or vice versa. In either event, the general term or category is `restricted to those things that are similar to those which are enumerated specifically.'" [Citation.]'" (Ibid.) "The rule is `based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' [Citations.] [¶] `In construing criminal statutes the ejusdem generis rule of construction is applied with stringency. [Citations.]' [Citation.]" (Id. at pp. 180-181.)
Had the Legislature intended to prohibit violent felons from possessing any bulletproof vest whatsoever, it would have constructed a definition restricted to just the first sentence of California Code of Regulations, title 11, section 942, subdivision (e). But it did not do this. Instead, it followed the first sentence with the second sentence, thus incorporating a specific ballistics testing regimen into the definition of body armor. The Attorney General's *Page 272 
broad reading of section 942, subdivision (e), clashes with the very structure of the subdivision and renders meaningless the language requiring body armor to meet the certification standards.
(2) Legislative history.
Reading the legislative history of section 12370 leads to the same conclusion. When section 12370 was enacted in 1998, there was already a California law defining bulletproof vests. Originally enacted in 1982, section 12022.2, subdivision'(b), currently provides, in pertinent part: "Any person who wears a body vest in the commission or attempted commission of a violent offense . . . shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one, two, or five years." Subdivision (c) of section 12022.2 provides: "As used in this section, `body vest' means anybullet-resistant material intended to provide ballistic andtrauma protection for the wearer." (Italics added.)
When section 12370 was drafted, the Legislature was aware of section 12022.2 and its definition of "body vest." The bill analyses from the Assembly and Senate Committees on Public Safety acknowledged the existence of section 12022.2, and specifically noted its definition of "body vest" in subdivision (c). Both bill analyses then indicated the new statute would contain a different definition of the proscribed garment: "Body Armor Definition. This bill defines bodyarmor by referencing the definition contained within theCalifornia Code of Regulations, Section 942, Title 11." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 2, underscoring omitted, italics added; see Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 3, italics added.)
The Attorney General gets this legislative history wrong, arguing: "[A]fter stating the definition contained in [California Code of Regulations, title 11,] section 942, the [committee] reports indicate that a `body vest' is defined `as any bullet-resistant material intended to provide ballistic and trauma protections for the wearer.' [Citations.] In other words, the committee defined `body armor' as a bulletproof vest, then defined `body vest' as any bullet-resistant material intended to provide ballistic protection for the wearer." In fact, however, the references in the committee reports to this much broader definition were references to section 12022.2's definition, not to the definition the Legislature chose to adopt for section 12370.
Hence, even if Saleem knew his garment qualified as a "body vest" under section 12022.2, because it was made out of some kind of bullet-resistant *Page 273 
material, the question remains whether Saleem, as a person of ordinary intelligence, would have any reasonable way of knowing his vest met the far more stringent requirements necessary to qualify as "body armor" under section 12370. The Legislature's decision in section 12370 to ignore section 12022.2, and instead reference the California Code of Regulations's definition of body armor, indicates a deliberate choice to use a differentstandard in the newer statute.[5]
(3) California decisions.
The third Heitzman factor looks at how California decisions have construed the statutory language. The only case interpreting section 12370 has been People v. Chapple,supra, 138 Cal.App.4th 540. In that case, the People appealed the dismissal of an information charging a violation of section 12370. The defendant had argued there was insufficient evidence to support the information because the only evidence his garment was proscribed by section 12370 came in the form of a police officer's lay opinion that the vest was "`a body armor vest, bullet proof vest.'" (People v. Chapple, supra, at p. 544.) Asked at the preliminary hearing how he knew what a bulletproof vest looked like, the officer testified he wore one and that his brother, who was also a police officer, had worn one. On appeal, the People did not challenge a ruling the officer could not testify as an expert, but instead "argue[d] that bulletproof vests, like firearms, are sufficiently within common experience to be identified at trial by lay witnesses." (Id. at p. 548.) Chapple rejected this argument, holding: "The crime charged consists of elementsincapable of determination by the trier of fact without theassistance of an expert. The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.' (Cal. Code Regs., tit. 11, § 942, subd. (e).) Clearly, whetheror not the vest seized in this case met such certificationstandards involved concepts beyond common experience, and, thus,was a proper subject for expert testimony, but not for a layopinion." (Id. at pp. 548-549, italics added, fn. omitted.)
We agree with Chapple's, conclusion that only an expert would know if any particular protective body vest was proscribed by section 12370.[6] And, if that *Page 274 
is so, then we do not see how, without providing something like an official list of prohibited vests, the statute can be said to provide either fair notice to a defendant or
meaningful guidelines to the officer on the street.
(4) Inadequate notice.
The constitutional issue here concerns the problem of providing adequate notice of exactly which protective body vests are prohibited by section 12370. As explained by cases construing bans on assault weapons, the void for vagueness doctrine requires such notice to be made in terms that are meaningful to people of ordinary intelligence.
Robertson v. City and County of Denver (Colo. 1994)874 P.2d 325, addressed an ordinance defining assault weapons as including "`[a]ll semiautomatic pistols, that are modifications of rifles having the same make, caliber and action design but a shorter barrel and no rear stock or modifications of automatic weapons originally designed to accept magazines with a capacity of twenty-one (21) or more rounds.'" (Id. at p. 334.) The trial court had concluded this language was vague because "`[p]ersons attempting to comply with this section must . . . learn not only what guns their pistol was designed from, but also learn the design history of the ancestor guns to determine if it was [an] automatic weapon `originally designed to accept magazines with a capacity of twenty-one (21) or more rounds' or if it has `the same' action design. These characteristics can not be readily [ascertained] by a person of common intelligence.'" (Ibid.)
The Colorado Supreme Court agreed with this reading: "[T]he assault weapon ordinance does not specify any source which would aid in defining what an assault pistol is, nor does it state where such a source can be found. [¶] [The ordinance] does not provide sufficient information to enable a person of common intelligence to determine whether a pistol they possess or may purchase has a design history of the sort which would bring it within this section's coverage. As the trial court correctly concluded, ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence. Consequently, we conclude that the trial court correctly determined that [the ordinance] is unconstitutionally vague." (Robertson v. City and Countyof Denver, supra, 874 P.2d at p. 335.)
Springfield Armory, Inc. v. City of Columbus (6th Cir. 1994) 29 F.3d 250, involved a challenge to a municipal ban on assault weapons. "The ordinance *Page 275 
defines `assault weapon' as any one of thirty-four specific rifles, three specific shotguns and nine specific pistols, or `[o]ther models by the same manufacturer with the same action design that have slight modifications or enhancements. . . .'" (Id. at p. 251) After asking, "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and shape and the caliber of ammunition it takes can all be altered,"Springfield Armory held the ordinance was void for vagueness: "Nothing in the ordinance provides sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage." (Id. at p. 253.)
Harrott v. County of Kings (2001) 25 Cal.4th 1138
[108 Cal.Rptr.2d 445, 25 P.3d 649], like In re Jorge M.,supra, 23 Cal.4th 866, construed the AWCA. The trial court held the plaintiff's semiautomatic rifle constituted an assault weapon under section 12276 on the ground it was an "AK series" weapon. Section 12276, subdivision (a), contains a list of prohibited rifles, identified by manufacturer and model number. Subdivision (e) of section 12276 provides: "The term `series' includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer." The trial court held the plaintiff's rifle was illegal even though expert witnesses for both sides agreed the rifle was not an AK series weapon because its manufacturer markings did not match any markings in the Attorney General's assault weapons identification guide, which was distributed to local law enforcement and published in the California Code of Regulations. The trial court relied on the fact the Kings County's expert had "conceded that any variations between this rifle and an AK reference weapon (the AK 47S) were only minor." (Harrott v. County of Kings, supra, at p. 1143.)
Harrott held, on due process grounds, the trial court had no authority to make this finding. "This case amply illustrates the difficulty an ordinary citizen might have, when a gun's markings are not listed in the Identification Guide, in determining whether a semiautomatic firearm should be considered an assault weapon under the AWCA." (Harrott v. Countyof Kings, supra, 25 Cal.4th at pp. 1146-1147, fn. omitted.) "Not only would ordinary citizens find it difficult, without the benefit of the Identification Guide, to determine whether a semiautomatic firearm should be considered an assault weapon, ordinary law enforcement officers in the field would have similar difficulty." (Id. at p. 1147, fn. 4.) "It can hardly be argued that this statute does not raise serious and doubtful constitutional questions as applied to ordinary citizens. The language found constitutionally problematic by the Sixth Circuit Court of Appeals in SpringfieldArmory . . ., and by the Colorado Supreme Court inRobertson v. City and County of Denver . . ., was more specific than the language at issue here." (Id. at p. 1153.) Our Supreme Court concluded *Page 276 
"ordinary citizens are not held responsible for answering the question raised by Mr. Harrott — which differences are only `minor' within the meaning of section 12276, subdivision (e)?" (Ibid.)
 3. For all the reasons set forth herein, we conclude section 12370 is void for vagueness.
As we have explained, ante, the core due process concern underlying the void for vagueness doctrine is fair notice. In the context of section 12370, that means the statute must provide a person of ordinary intelligence with a reasonable opportunity to determine if his or her body vest falls within the subset of body vests prohibited by section 12370.
We have no doubt Saleem knew he was in possession of a body vest. The evidence shows the vest weighed about 10 pounds and Saleem obviously knew he was wearing it. Was he given a reasonable opportunity to determine if his vest was illegal under section 12370?
Officer Rivera, who was not an expert, opined on the basis of his military experience in Iraq that Saleem's vest would protect against various handgun ammunition. But Rivera's opinion was based on having participated in a field test that Officer Kehr, who was an expert, characterized as entirely inadequate for certification purposes. As Chapple held: "The crimecharged consists of elements incapable of determination by thetrier of fact without the assistance of an expert. The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.' (Cal. Code Regs., tit. 11, § 942, subd. (e).)Clearly, whether or not the vest seized in this case metsuch certification standards involved concepts beyond commonexperience, and, thus, was a proper subject for experttestimony, but not for a lay opinion." (People v.Chapple, supra, 138 Cal.App.4th at pp. 548-549, italics added, fn. omitted.) If it takes an expert to make this determination, how can the statute have provided fair notice to Saleem?
The expert here, Officer Kehr, knew how to measure ballistic resistance properly, and he was aware of how such factors as a bullet's weight, shape, composition, jacketing and velocity would affect its ability to penetrate a particular body vest. He testified Saleem's vest was a flak jacket designed to protect against shrapnel from exploding mines and hand grenades, not bullets. But Kehr also testified he believed Saleem's vest would protect against certain handgun ammunition. We do not see why an ordinary person should have known a body vest designed to stop shrapnel nevertheless had ballistic capabilities bringing it within the subset of vests outlawed by section 12370. *Page 277 
The use-and-care pamphlet inside Saleem's vest carried the following warning: "This vest does not protect you againstsmall arms fire" We think an ordinary person would understand "small arms" to include handguns.[7] Nevertheless, Kehr testified this warning did not change his opinion about the ballistic capabilities of Saleem's vest because, "even though technically handguns are part of small arms fire," the military "usually refers to small arms fire as machine guns and rifles." We do not think a person of ordinary intelligence should have been aware of this special military meaning of "small arms." Granted, the label on Saleem's vest also said it was body armor. But, as we have explained, section 12370 establishes a very technical definition of body armor; it does not mean any garment popularly known as a bulletproof vest.
The Legislature specifically crafted section 12370 to incorporate the technical definition of body armor contained in the California Code of Regulations. The regulations's technical definition entails a rigorous testing regimen requiring the use of sophisticated testing facilities to establish that a particular body vest will protect against specified test ammunition.[8] Even if Saleem had read section 12370 and the regulations, he could not have reasonably ascertained his vest possessed the characteristics making it illegal under section 12370. This failure to provide fair notice is exactly what offends due process. Hence, we conclude section 12370 violates the void for vagueness doctrine and that Saleem's conviction must be reversed.[9] *Page 278 
 DISPOSITION
The judgment is reversed.
Croskey, J., concurred.
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] By "IED" Kehr was presumably referring to the improvised explosive devices used by insurgents in the Iraq war.
[3] Section 946, subdivision (b) of California Code of Regulations, title 11, provides:
"(1) For Type I Armor:
"(A) The 38 SPL test bullets shall be LEAD R.N. (Remington #3854) with nominal mass of 10.2 grams (158 grains) and measured velocities of 259 + 6 m/s (850 + 21 ft.) per sec.
"(B) The 22 LRHV test bullet shall be LEAD R.N. with nominal mass of 2.6 grams (40 grains) and measured velocities of 320 + 8 m/s (1050 + 26 ft.) per sec.
"(2) For Type IIA Armor:
"(A) The 357 MAG test bullets shall be LEAD SWC or equivalent JSP (Remington #357M5), with nominal mass of 10.2 grams (158 grains) and measured velocities of 397 + 10 m (1300 + 33 ft.) per sec.
"(B) The 9 mm test bullets shall be FMJ (Remington #R9MM2) with nominal mass of 8 grams (124 grains) and with measured velocities of 336 + 9 m (1100 + 28 ft.) per sec.
"(3) For Type II Armor:
"(A) The 357 MAG test bullets shall be JSP (Remington #R57M3) with nominal masses of 10.2 grams (158 grains) and with measured velocities of 425 + 11 m/s (1395 + 35 ft.) per sec.
"(B) The 9 mm test bullets shall be FMJ (Remington R9MM2) with nominal masses of 8 grams (124 grains) and with measured velocities of 358 + 9 m/s (1175 + 30 ft.) per sec.
"(4) For Type III Armor: The 7.62 mm (308 Win) bullets shall be FJM (U.S. Government Issue) with a nominal mass of 9.7 grams (150 grains) and with measured velocities of 873 + 22 m/s (2863 + 72 ft.) per sec.
"(5) For Type IV Armor: The 30-06 bullet shall be AP (U.S. Government Issue) with a nominal mass of 10.8 grams (166 grains) and with measured velocities of 838 + 21 m/s (2750 + 69 ft.) per sec."
[4] Section 20 provides, "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."
[5] The legislative history provides no explanation for why, when it enacted section 12370, the Legislature did not either adopt the broad definition of "body vest" contained in section 12022.2, subdivision (c), or publish a list of the proscribed protective body vests by manufacturer and model number.
[6] Chapple did not, however, conclude an expert had to have tested the particular vest in question: "Because neither party contends [the police officer] was qualified as an expert in this case, there is no need to address the types of information an expert can rely on in order to provide the opinion required in a prosecution of this nature. The apparent assumption in the People's brief that a prosecution expert would be obligated `to scientifically test body armor in order to survive a preliminary hearing' is unfounded. The expert may, of course base an opinion on personal observation, including experiments conducted personally by him or her. But the Evidence Code also permits the expert to rely on `matter . . . made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates (Evid. Code, § 801, subd. (b).)" (People v.Chapple, supra, 138 Cal.App.4th at p. 548, fn. 6.)
[7] The American Heritage Dictionary of the English Language (1973) defines "small arms" as "Firearms carried in the hand." Webster's Collegiate Dictionary (5th ed. 1946) defines "small arms" as "Arms carried on the person and used in the hands; now, generally, only portable firearms." The Merriam-Webster OnLine dictionary defines "small arm" as "a handheld firearm (as a handgun or shoulder arm) — usually used in plural." (http://www.merriam-webster.com/dictionary/smallarm [as of Dec. 17, 2009].)
[8] Saleem's jury was instructed: "Body armor is popularly called a bulletproof vest. As used in these instructions, body armor means those parts of a vest or garment that provides ballistic resistance to the penetration of any of the following ammunition:
"1. Handgun ammunition manufactured for commercial consumption in the calibers of
"(a) .22 caliber long rifle high velocity, or
"(b) .38 special, or
"(c) .357 magnum, or
"(d) nine millimeter, or
"2. Rifle ammunition manufactured for commercial consumption in the calibers of:
"(a) 7.62 millimeter or
"(b) 30 odd six."
[9] Given this result, we need not reach Saleem's contentions there was insufficient evidence he knew he was wearing illegal body armor, and that the trial court failed to properly instruct the jury on the definition of body armor.